Revised May 11, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 98-50061**

---

**CAROLYN J. GIBBS,**

**Plaintiff-Appellant,**

**VERSUS**

**ASHLEY C. GIBBS, A Minor Child; and**
**ANDREW F. GIBBS, a Minor Child,**

**Intervenor Plaintiffs-Appellees,**

**VERSUS**

**GENERAL AMERICAN LIFE INSURANCE COMPANY,**

**Defendant-Appellee.**

---

Appeal from the United States District Court
for the Western District of Texas

---

April 21, 2000

Before POLITZ, DeMOSS, and BENAVIDES, Circuit Judges.

DeMOSS, Circuit Judge:

Carolyn J. Gibbs (hereinafter "Appellant") appeals from the final judgment in her ERISA action which awarded attorneys' fees to both the Defendant-Appellee, General American Insurance Company

(hereinafter "General American"), and to the Intervenor Plaintiff-Appellees, Ashley C. Gibbs and Andrew F. Gibbs, both minors (hereinafter "Intervenors"). Appellant contends that the district court erred in denying her request for attorneys' fees against General American because she was the prevailing party, and that the Court also erred in awarding attorneys' fees and costs to both Intervenors and General American out of the disputed insurance proceeds which were being held in the court's registry. Appellant also contends that the district court erred in admitting certain polygraph results into evidence during the bench trial, and in relying on such evidence in awarding attorneys' fees.

## I. FACTUAL BACKGROUND

Carolyn J. Gibbs was married to Joel W. Gibbs in 1988. During their marriage they had two children, Ashley and Andrew. Mr. Gibbs maintained employment as a director of operations for Waco Magnetic Imaging, which provided him, as part of his benefits package, a life insurance policy issued through General American Life Insurance Company ("General American"). That policy designated Carolyn Gibbs, as the policy's named beneficiary, with life benefits in the amount of one times Mr. Gibbs' annual salary rounded to the next even thousand dollars ($42,000) with double indemnity accidental death benefits (for a total of $84,000 in the event of accidental death).

At some point in 1994, Appellant contacted a former boyfriend, Bartley Bell, after seeing his appearance on an episode of the Oprah Winfrey television show.  Bell was then attending college in Alabama.  The two began corresponding and spoke on the phone almost daily.  At one point in 1995, Appellant flew to Alabama to attend Bell's high school reunion.  During their correspondence with one another, they discussed their feelings for one another and their plans for a future together.  Due to marital problems, the Gibbses separated from one another on several occasions during 1995.[1]  In December of the same year, Mr. Gibbs filed for a divorce and moved out of the family residence.  The divorce agreement drafted by Mr. Gibbs' attorney, and which Appellant had agreed to sign, would have given Mr. Gibbs the authority to determine where the children would live.  Upset by the divorce proceedings, Appellant told one of her friends, Stephanie Grimm, that it would have been a lot easier for her if Mr. Gibbs were killed in a car wreck.

On January 25, 1996, Appellant took her children to a Mother's Day Out program at the Crestview Church of Christ.  She had planned her class schedule at Baylor University for the Tuesdays and Thursdays that this program was offered.  Shortly after arriving at the church, Appellant testified that she discovered her son Andrew had forgotten his lunch.  She told him that his father would bring

---

[1]  Both of the Gibbses testified to frequenting night clubs with their own friends and having engaged in adulterous relationships. Appellant regularly spent time with a girlfriend, Suzanne Truitt, with whom she had often entered nightclub bikini contests.

it to him.  But when Andrew began crying, she promised to bring it to him herself.  At approximately 9:30 a.m., she called Mr. Gibbs' office, but he was on another phone call.  She left a message with Pat Johnson, the office manager, that she was late for her classes and that Mr. Gibbs needed to go by her townhouse to get Andrew's lunch bag and take it to him at the church.  She advised Johnson to tell Mr. Gibbs that the kitchen door was unlocked.

After receiving the telephone message, Mr. Gibbs left his office at approximately 9:50 a.m. to retrieve his son's lunch. After several hours had passed without his return, and because he had not responded to numerous pages and telephone calls, his co-workers contacted the police.  After her classes ended at 2:00 p.m., Appellant arrived to pick up her children at the church around 2:30 p.m. -- Andrew was crying because his daddy had never shown up with his lunch.  When she arrived with the children back at her townhouse, she found Mr. Gibbs' car in her carport.  Also present was a police car and a uniformed officer who informed Appellant that the police had been called by Mr. Gibbs' co-workers when he failed to return to work.

Appellant told the officer to drive around the front of the house because of the dog in the backyard.  She proceeded into the house through the back door, and upon entering the house noticed that it was messy.  Pictures and videos were spread out on the floor and drawers were opened as if they had been searched.  She received no response upon calling out Mr. Gibbs' name.  When she

4

went upstairs, she found his body lying in the hallway with blood everywhere. She then ran back downstairs and took the children out the front door.

The police then entered the house and found Mr. Gibbs' body. They initially told Appellant that Mr. Gibbs appeared to have taken his own life, but it was later determined that he had been stabbed repeatedly and his throat had been cut open a number of hours before he was discovered. The Hewitt Police Department released the townhouse back to Appellant by 5:00 p.m. that same afternoon. The very next day, Appellant's father, who had arrived the previous evening from Colorado, organized the efforts of Appellant's Sunday school class in cleaning the murder scene. They ripped out the blood-stained carpet, repainted the walls, and generally cleaned up all indications that a murder had occurred. Ms. Truitt also visited the townhouse and removed incriminating love letters which she had written to the Appellant.

In an effort to solve the murder, the Hewitt Police Department enlisted the aid of the Texas Rangers; however, their investigation did not begin until after Appellant's friends and family had completely cleaned the murder scene.[2] The murder weapon was located sometime thereafter. Appellant, who later found additional bloodstains when she returned for a final clean-up on January 31 ,

---

[2] Upon their arrival at the crime scene, the Texas Rangers ordered Appellant's friends and family to cease their cleaning operations and to disperse from the crime scene.

5

notified the police of the same. Ultimately, the following items were identified as missing from the townhouse: a camcorder, some home videos, Appellant's high school class ring, and one of the children's silver baby mugs. Ten days after the murder, the Texas Rangers requested that Appellant submit to a polygraph examination, but upon the advice of her counsel, she refused.[3]

Appellant and her children then moved in with Ms. Truitt for approximately four weeks. They then moved to Colorado Springs to live with her parents. By January of 1997, Appellant's former boyfriend, Bartley Bell, had moved to Colorado, where the two were married that July.

In April 1996, Appellant first submitted a claim to General American for the proceeds of Mr. Gibbs' aforementioned life insurance policy. Due to an improper address, General American received the claim three months later. Having been advised by Mr. Gibbs' employer that Appellant was a suspect in her husband's death, General American contacted the Hewitt Police Department which advised that, indeed, Appellant had not been ruled out as a suspect.

In October 1996, Appellant contacted General American to inquire as to the status of her pending claim. Again, General

_____

[3] Appellant subsequently, and approximately two weeks before the trial of this matter, did voluntarily submit to a polygraph examination administered by a licensed polygrapher at the Texas Department of Public Safety. The overall analysis indicated that she had been deceptive in her answers.

6

American contacted the Hewitt Police Department, which again advised that Appellant had not yet been ruled out as a suspect. General American then wrote to Appellant and advised her that her claim could not be paid until the investigation into Mr. Gibbs' death had been completed.[4] Appellant declined to exercise her rights under a provision of the policy which would have permitted her, as a beneficiary under suspicion of involvement in the insured's death, to waive payment of the insurance proceeds to her directly and to have the proceeds flow directly to her minor children.

## II. PROCEDURAL HISTORY

In February 1997, Carolyn Gibbs filed this action under ERISA, as the named beneficiary of an ERISA plan, alleging that General American failed to pay benefits under 29 U.S.C. § 1132(a)(1)(B), and she requested attorneys' fees pursuant to ERISA's fee provisions, *see* 29 U.S.C. § 1132(g), because General American's failure to pay was allegedly in bad faith. Upon the filing of the ERISA claim, General American filed an interpleader counterclaim pursuant to Rule 22 of the Federal Rules of Civil Procedure, depositing $88,852.00 (the insurance proceeds plus interest) into

---

[4] General American's beneficiary-involved-in-death policy, found in their death procedures manual, required that it be established beyond a reasonable doubt that the beneficiary was not involved in the death of the insured prior to benefits being paid.

the district court's registry. General American never contested its obligation to pay, but pleaded that it was facing potential exposure to conflicting claims from Appellant and the minor children for the proceeds because Carolyn was a suspect in Mr. Gibbs' murder. General American sought to compel the intervention of the Gibbses' minor children and to be itself released from the case. General American also requested an award of attorneys' fees at the time it moved to be dismissed from the case.

The district court refused to let General American out of the case upon interpleader and required that it litigate the issue of Appellant's entitlement to attorneys' fees under ERISA. The district court reasoned that General American's alleged bad faith was in issue because it withheld payment and failed to file its interpleader before Appellant filed her ERISA action, which was nearly one year after her first request for the proceeds.

In its order permitting the interpleader, the district court appointed a guardian ad litem, John A. Kuchera, to represent the children's interests. The guardian ad litem filed an Intervenor complaint on their behalf, pleading that the children were entitled to the insurance proceeds pursuant to § 21.23 of the Texas Insurance Code. Intervenors' claim was not based upon ERISA because the children were never designated in any ERISA plan document as, and never claimed to be, beneficiaries under an ERISA plan. Rather, their claim was based solely upon § 21.23, which would automatically divest Carolyn of her interest in the proceeds

8

if it was established by a preponderance of the evidence that she was a "principal or an accomplice in willfully bringing about the death of the insured." TEX. INS. CODE ANN. § 21.23.  Intervenors also requested their attorneys' fees and costs.[5]

The case was tried to the bench.[6]  The two issues being tried were:  (1) Appellant's and Intervenors' competing claims of entitlement to the insurance proceeds in the court's registry, and (2) whether Appellant was entitled to attorneys' fees and costs under ERISA based upon General American's alleged bad faith.  Two ancillary issues were whether General American and Intervenors were entitled to attorneys' fees and costs.  At the end of the trial, the district court held as follows:

First, with respect to the competing claims for entitlement to the insurance proceeds, the district court held that Intervenors

_____

[5]  As will be discussed below, since Intervenors' complaint was not based upon ERISA, the attorneys' fees provisions of 29 U.S.C. § 1132(g) do not govern the analysis of the guardian ad litem's request for fees and costs.

[6]  Appellant had asked for a jury trial but the court sua sponte struck her jury request because claims under ERISA are equitable in nature and are not entitled to a jury trial.  The district court was correct insofar as the claim for attorney fees by Carolyn against General American is concerned.  However, we express doubt as to whether the district court properly denied a jury sua sponte with regard to the dispute between Appellant and Intervenors as to who was entitled to the proceeds under Texas law.  Irrespective of our doubt, as the denial of a jury trial was never raised on appeal by any party and because the record reveals no objection to the case proceeding without a jury, the issue is beyond the scope of our review.  *See e.g., **Jones v. Birdsong**, 679 F.2d 24, 24 (5th Cir. 1982) (failing to object to case proceeding without a jury constitutes waiver of the right to a jury trial).

9

had not sustained their burden of establishing that Appellant caused or was involved in the death of her husband by a preponderance of the evidence under Section 21.23.[7] Thus, the proceeds went to Appellant.

Second, with respect to Appellant's claim for attorneys' fees and costs, the district court found that General American had not acted in bad faith and, therefore, it denied Appellant's request. With respect to General American's request for attorneys' fees and costs, the district court determined that General American was entitled to have its attorneys' fees ($21,100.25) paid out of the interpleaded insurance proceeds so as to deter other beneficiaries from filing premature lawsuits to collect insurance benefits when they are suspected of involvement in the death of the insured. Finally, with respect to Intervenors' claim for attorneys' fees, the district court determined that the guardian ad litem for the intervening children was entitled to have his fees and costs ($19,047.98) paid out of the interpleaded insurance proceeds. On December 16, 1997, judgment was entered in favor of General American as to Appellant's claim against it, and in favor of Appellant as to Intervenors' claim against her. In its subsequent order assessing fees and costs against Appellant, the district

---

[7] Specifically, the district court stated "[i]t is likely that Plaintiff was involved in the death of Gibbs, but, in a close case, the evidence presented does not prove her involvement by a preponderance of the evidence." Curiously, we find no notice of appeal by the Intervenors as to this determination by the district court.

10

court ordered that all interpleaded funds remaining after payment of the ordered fees and costs be paid to Appellant.[8]

Appellant timely appealed the district court's awards of attorneys' fees, and a prior panel of our Court considered her appeal and issued an opinion. *See Gibbs v. Gibbs*, 167 F.3d 949 (5th Cir. 1999). That opinion was vacated on April 22, 1999, when the prior panel construed Intervenor Plaintiff-Appellees' petition for rehearing *en banc* as a petition for panel rehearing and granted the same. *See Gibbs v. Gibbs*, 173 F.3d 946 (5th Cir. 1999), *vacating* 167 F.3d 949 (5th Cir. 1999).

In support of their petition for rehearing, Intervenors advanced two arguments. First, they argued that the prior panel's

---

[8] Despite finding that Appellant failed to prevail on her claim of bad-faith failure to pay benefits, the district court's finding that Appellant's involvement in the murder had not been established by a preponderance of the evidence precluded General American from continuing to withhold payment of the insurance benefits based upon a provision which allowed it to do so until a suspected beneficiary's non-involvement is established beyond a reasonable doubt. General American never asserted that it did not owe the money to someone -- either Appellant or Intervenors, and once the district court determined that Intervenors did not prevail in their claim of superior rights to the insurance proceeds, by default, those proceeds flowed to Appellant, the named beneficiary. Appellant argues that she was indeed the prevailing party because the end result of her ERISA claim was that General American was ordered to pay her the disputed proceeds. We note, however, that the central issue involving Appellant's ERISA claim below was only whether General American acted in good faith in refusing to pay Appellant directly, before the level of her involvement in the murder was established and the potentially conflicting and duplicative claims of the minor children could be addressed -- and this issue related solely to whether Appellant should be awarded her attorneys' fees and costs based on General American's alleged bad faith.

decision that the district court abused its discretion in awarding fees and costs to their guardian ad litem because they did not "prevail" on their claim, overlooked and ignored the distinction between the role of a party and the role of a guardian ad litem, and the panel's decision in this regard conflicted with both Supreme Court and Fifth Circuit precedent, which distinguishes between the compensation to be awarded attorneys and compensation to be awarded other court personnel, and which establishes that a guardian ad litem need not prevail in order to be entitled to his fees.[9] Second, they argued that the prior panel failed to address their cross-point -- that Intervenors had in fact established Appellant's involvement by more than a preponderance of the evidence, and thus, they were entitled to an award of the insurance proceeds. This later cross-point is not before our Court because no cross-appeal was filed. *See* **United States v. Coscarelli**, 149 F.3d 342 (5th Cir. 1998) (en banc).

Thus, the subject of this appeal is not the district court's

_____

[9] These contentions were never made in Intervenors' original responsive brief, but rather were presented for the first time following the prior panel's entry of an opinion denying the guardian ad litem's fees altogether. In Intervenors' original responsive brief, they argued only their cross-point – that they had in fact established Appellant's involvement by more than a preponderance of the evidence, and thus, they were entitled to an award of the insurance proceeds. Presumably, Intervenors assumed from Appellant's brief and General American's reply, that either of those two parties would ultimately be responsible for the ad litem fees, and that no defense of the district court's award thereof was necessary.

12

conclusion that Appellant failed to prevail on her claim against General American of bad faith failure to pay benefits under ERISA,[10] but rather, it is based entirely on the propriety of the district court's awards of attorneys' fees and costs and the alleged impropriety of admitting polygraph evidence.

## III.  ANALYSIS

Before we can fully address Appellant's contention that the district court erred in denying her request, and in granting both General American's and Intervenors' request for, fees and costs, we must first resolve her related secondary issue, that is, whether the district court erred in admitting and allegedly relying upon certain polygraph evidence in determining whether to award fees.

### A.  Admissibility of Polygraph Evidence

Several weeks prior to the commencement of the trial of this matter, Appellant took and passed a private polygraph examination, and based upon those favorable results, she agreed to submit to a second polygraph examination to be administered by the Texas Department of Public Safety, whose earlier request for a polygraph examination she had denied.  As noted above, the overall analysis of this second examination indicated that she had been deceptive in

_____

[10] As noted above, the parties do, however, disagree as to which of them was the "prevailing party" to the extent that such designation is determinative of the award of attorneys fees.

her answers, and specifically the test results revealed the following:

> A. There existed an 88% probability that Appellant was deceptive when she answered "no" to the question: "Did you plan with any man to cause the death of Joel [Mr. Gibbs]?";

> B. There existed a 98% probability that Appellant was deceptive when she answered "no" to the question: "Did you intentionally set up Joel, causing his death?";

> C. There existed a 99% probability that Appellant was deceptive when she answered "no" to the question: "Prior to arriving at your house on the afternoon of January 25, did you already know someone was going to cause the death of Joel?"; and

> D. There existed a 56% probability that Appellant was deceptive when she answered "no" to the question: "Did anyone ever tell you that they caused the death of Joel?".

Appellant asserts that the district court erred in relying upon the polygraph evidence as a basis for assessing attorneys' fees against her. General American responds that since the district court determined that the evidence did not establish Appellant's involvement by a preponderance of the evidence, the issue of whether the polygraph evidence was properly admitted is irrelevant to the district court's discretion in awarding attorneys' fees. However, it is Appellant's position that there was no physical or circumstantial evidence linking her to the death of Mr. Gibbs, and as a result, the district court must have based its fees decision on the polygraph results. This assertion overlooks the fact that the lack of any physical evidence is

14

directly attributable to the actions of Appellant and her friends and family in so quickly erasing the crime scene. This assertion also ignores evidence concerning Appellant's phone call, which placed Mr. Gibbs at the crime scene, and the following circumstantial facts which our review of the record has revealed: (1) Appellant gave conflicting testimony as to whether, when, and from where she made the call which placed Mr. Gibbs at the murder scene; (2) there is competent and uncontroverted evidence that Appellant told Stephanie Grimm, a friend, in the midst of the Gibbses' divorce negotiations, that it would be so much easier for her if Joel were simply killed in a car wreck; (3) the murder weapon was recovered in Appellant's kitchen (one of her own kitchen knives which had been wiped clean and placed back in the knife block); (4) Appellant was desperate for money to pay for college tuition (she had asked her parents to co-sign a loan, which they refused to do, and as a result she ended up having to take out a more expensive student loan); and (5) in an apparent slip of the tongue, when confronted by Stephanie Grimm concerning Ms. Grimm's fear that Appellant was involved in Joel's murder, it was Appellant herself who first interjected the idea of murder-for-hire, by responding defensively, and in a tone which Grimm perceived as argumentative, "how do I know *you* didn't hire someone to kill Joel?" This circumstantial evidence, coupled with a lack of physical evidence which is directly attributable to Appellant's own

15

actions in erasing the crime scene, leads us to conclude that the polygraph evidence was not the *only* evidence upon which the district court could have based its fees decision.

Also, there is little indication in the record that, in fact, the district court based the award of fees on the polygraph results; to the contrary, the district court explicitly determined that the fees should be awarded based upon the premature filing of this lawsuit at a time when Appellant knew she was under suspicion, and when there was "absolutely no basis for believing that [General American] had acted in bad faith."

Furthermore, as this Court has denounced the per se rule that polygraph examinations are inadmissible, *see* **United States v. Posada**, 57 F.3d 428, 434 (5th Cir. 1995), the standards announced in **Daubert** control the admissibility of such results. In **Daubert v. Merrell Dow Pharmaceuticals, Inc.**, 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court stated that a district court should analyze: (1) the scientific validity of the method; (2) the extent to which the trier of fact will be assisted in understanding the evidence and determining the fact at issue; and (3) whether the evidence will have a prejudicial effect which is not outweighed by its probative value. *See* **id**. at 2796-2798. Most of the safeguards provided for in **Daubert** are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury. In this case, the district court was satisfied with the

16

testimony of Peter Heller, the polygraph examiner for the Texas Department of Public Safety, who testified in detail regarding the factors and analysis involved in the examination process at issue, and the district court concluded that the examination results of Appellant's test were scientifically valid. We conclude that the polygraph evidence in this bench trial was properly admitted without error by the district court, and furthermore, irrespective of the propriety of admitting the polygraph results, the district court did not rely solely on the polygraph results in awarding attorneys' fees and costs.

### B. Awards of Attorneys' Fees and Costs

Having rejected Appellant's argument that the district court improperly relied upon inadmissible polygraph results, we now turn to a determination of whether the district court erred in awarding fees to the respective parties. It is well settled that the district court has broad discretion in determining the appropriateness of an award of attorneys' fees, and we review its award or denial thereof for an abuse of that discretion. *See **Todd v. AIG Life Ins. Co.***, 47 F.3d 1448, 1458 (5th Cir. 1995).

### 1. Fees and costs governed by ERISA

The relevant ERISA fee provision provides in pertinent part:

> [i]n any action . . . by a participant, beneficiary, or fiduciary, the court in its

discretion may allow a reasonable attorney's fee and costs of action to either party.

29 U.S.C. § 1132(g)(1).

Since, as noted above, this case really involved two separate actions: (1) Appellant's claim against General American for failure to pay ERISA benefits to which she was entitled, which claim arose under ERISA, and (2) Intervenor's claim of entitlement to the proceeds, which claim arose under § 21.23 of the Texas Insurance Code, only the fee requests by the parties to the former action are governed by the provisions of 29 U.S.C. § 1132(g)(1).  That is to say, we review only the district court's award of fees and costs to General American and its denial of fees and costs to Appellant under ERISA's fee provisions.

### a. Must a party first prevail in order to be eligible for consideration for attorneys' fees and costs under ERISA's fee provision, 29 U.S.C. § 1132(g)(1)?

Appellant urges that as the only prevailing party,[11] she is the only party eligible for consideration of fees under ERISA.  Her claim is based upon the premise that a party must first prevail in an ERISA action in order to be eligible for consideration for

---

[11] The district court entered judgment in favor of General American on her claims against it, but then paradoxically ordered that once all fees had been deducted from the interpleaded funds, because Intervenors had failed to establish superior entitlement to the proceeds, the remaining funds were to be paid to Appellant. Arguably, she did prevail on her claim for failure to pay benefits, but not on her request for attorneys' fees based on *bad faith* failure to pay.

attorneys' fees. Thus, a threshold inquiry in this appeal is whether or not a party must be deemed to have prevailed in order to recover attorneys' fees under ERISA's fees provisions, and it is an inquiry which, until the prior panel entered its now-vacated opinion, this Court had yet to squarely address. That issue has also created a split of authority among a number of our sister circuit courts of appeal.

The proper starting point for this analysis is with the language of ERISA's attorneys' fee provision itself, which as noted above, permits the district court, in its discretion, to award "reasonable attorney's fees and costs . . . to *either* party." 29 U.S.C. § 1132(g)(1) (emphasis supplied). Conspicuously absent from this language is the term "prevailing" which term has generally been included in the other fee-shifting statutes enacted by Congress. *See, e.g.,* 42 U.S.C. § 2000e-5(k). The debate on this particular issue centers around whether courts should read a prevailing party requirement into the "either party" language of § 1132(g)(1).

In determining whether a party must prevail in order to be eligible for an award of attorneys' fees, the Fourth Circuit in *Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201 (4th Cir. 1997), explicitly held that "only a prevailing party is entitled to consideration for attorneys' fees in an ERISA action." *Martin*, 115 F.3d at 1210. The analysis which precedes the Fourth

Circuit's conclusion refers to the "prevailing party" limitation which "many of our sister circuits have imposed . . . on the availability of attorneys' fees under ERISA." *Id*.

Specifically, the *Martin* court cites to cases from the First, Third, Fifth, Seventh, Ninth, and D.C. Circuits as having "imposed a prevailing party requirement" on an award of fees under ERISA. Our review of the decisions cited by the *Martin* court reveals that many of the circuits, while stating that awards of attorneys' fees are appropriate for prevailing parties in ERISA actions, do not in so stating, foreclose the ability of non-prevailing parties to obtain an award of fees. And of those cases cited, only one decision from the Seventh Circuit can be read as going so far as to actually *require* a party to prevail before a district court could consider an award of attorneys' fees.

In *Little v. Cox's Supermarkets*, 71 F.3d 637, 644 (7th Cir. 1995), the Seventh Circuit focused on the bottom-line question of the losing party's exercise of good faith in determining whether an award of fees under ERISA was due the prevailing party. More recently, the Seventh Circuit has twice moved closer to actually requiring a party to prevail before it can be eligible for an award of fees. *See Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998) (describing the two processes by which an ERISA party may be awarded attorneys' fees "after it has attained 'prevailing party' status"); *Poteete v. Capital Eng'g, Inc.*, Nos.

20

98-1531 & 98-1772, 1999 WL 517174, at *3 (7th Cir. July 21, 1999) (noting that the "principles that sometimes entitle a party to recover his attorneys' fees limit that entitlement to prevailing parties") (citing 29 U.S.C. § 1132(g)(1)).

The remaining circuit decisions cited by the **Martin** court simply *do not require* that a party prevail as a pre-requisite to consideration for an award of attorneys' fees, and more recent decisions from those circuits hold to the contrary -- that a party need not prevail in order to be entitled to consideration for fees under ERISA. While the First Circuit in the case cited by the **Martin** court literally read the word "prevailing" into the relevant ERISA fee provision, *see* **Cottrill v. Sparrow, Johnson & Ursillo, Inc.**, 100 F.3d 220, 225 (1st Cir. 1996) (stating "Congress declared that, in any ERISA claim advanced by a 'participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee' to the prevailing party") (quoting 29 U.S.C. § 1132(g)(1)), it has more recently recognized by implication that such awards are not limited to prevailing parties. *See* **Doe v. Travelers Ins. Co.**, 167 F.3d 53, 61 (1st Cir. 1999) (stating that "such awards are *normally* for the prevailing party" and thus implying that such awards for non-prevailing parties are contemplated by § 1132(g)(1) (emphasis supplied)).

In a decision overlooked by the **Martin** court, the Third Circuit held that while § 1132(g)(1) allows for an award of fees

21

and costs to either party, it does not "automatically mandate an award to a prevailing party." ***Anthuis v. Colt Indus. Operating Corp.***, 971 F.2d 999, 1010 (3ᵈ Cir. 1992). Like the decision from the Third Circuit which was cited by the ***Martin*** court, *see* ***McPherson v. Employees' Pension Plan***, 33 F.3d 253, 254 (3ᵈ Cir. 1994), this decision fails to squarely address whether the Third Circuit *requires* prevailing status before a party may be entitled to consideration for an award of attorneys' fees.

In the Ninth Circuit decision cited by the ***Martin*** court, *see* ***Flanagan v. Inland Empire Elec. Workers Pension Plan & Trust***, 3 F.3d 1246, 1253 (9ᵗʰ Cir. 1993), the Ninth Circuit held that though it had previously stated in dictum that the ERISA fee provision allows the court to award non-prevailing parties their attorneys' fees, "plaintiffs cannot recover fees under section 1132(g)(1) until they succeed on [some] significant issue in litigation which achieves some of the benefit . . . sought in bringing the suit." Arguably, this statement applies only to fee requests by plaintiffs in ERISA actions and not to defendants or intervening parties. Indeed, prior to its holding in ***Flanagan***, the Ninth Circuit stated that the criteria used to determine whether an ERISA party is entitled to an award of attorneys' fees "do not rely on the prevailing-party doctrine." ***Sokol v. Bernstein***, 812 F.2d 559, 561 (9ᵗʰ Cir. 1987). And more recently, the Ninth Circuit, in an unpublished decision, acknowledged that fee awards under

22

§ 1132(g)(1) are not limited to prevailing parties. *See **Green v. Hotel Employees & Restaurant Employees Int'l Welfare-Pension Funds***, No. 95-16314, 1997 WL 8466, *4 (9th Cir. Jan. 1, 1997) (unpublished table decision) (stating that "[a]lthough Section 1132(g)(1) *does not limit such an award to a prevailing party*, awarding attorney fees to an unsuccessful litigant would not serve any of the purposes underlying Section 1132(g)(1)") (emphasis supplied).

Though not mentioned by the **Martin** court, both the Tenth and Eleventh Circuits have also recognized that a party need not prevail in order to be entitled to attorneys' fees. *See **Chambers v. Family Health Plan Corp.***, 100 F.3d 818, 827 (10th Cir. 1996) (stating that "'[a]lthough the statute [§ 1132(g)(1)] does not require that a party prevail as a condition to receiving an award of attorneys' fees . . ., we have remanded cases for denial of fees without explanation only when the party seeking fees had prevailed at least partially . . . .'") (quoting **Morgan v. Independent Drivers Ass'n Pension Plan**, 975 F.2d 1467, 1471-72 (10th Cir. 1992)); *see also **Freeman v. Continental Ins. Co.***, 996 F.2d 1116, 1119 (11th Cir. 1993) (stating that "[u]nlike other fee-shifting provisions, which give the court discretion to award fees to a prevailing party, § 1132(g)(1) allows a court to award fees to either party."). Like the Eleventh Circuit, the Second Circuit has also explicitly stated that a party need not prevail under ERISA in order to be entitled to consideration for attorneys' fees. *See*

23

***Miller v. United Welfare Fund***, 72 F.3d 1066, 1074 (2ᵈ Cir. 1995) (stating that "Section 502(g)(1) [*codified at* 29 U.S.C. § 1132(g)(1)] contains no requirement that the party awarded attorneys' fees be the prevailing party.")

With regard to this Circuit's take on this issue, at first blush, the Fourth Circuit's holding in ***Martin*** appears to be consistent with our statements in ***Boggs v. Boggs***, 82 F.3d 90 (5ᵗʰ Cir. 1996), *rev'd on other grounds*, 520 U.S. 833, 117 S. Ct. 1754 (1997). In ***Boggs***, we stated that ERISA "allows the court to award ERISA beneficiaries, participants, and fiduciaries reasonable attorney's fees when they are the prevailing party." ***Id***. at 94 n.1. But while this statement in ***Boggs*** seems to require a party to prevail, arguably, it requires only that principal plaintiffs who bring suits under ERISA prevail in order to be entitled to their fees. ***Boggs*** simply does not speak to the propriety of awarding fees to prevailing defendants, or to other third parties who may have been forced to join in an ERISA action.

More instructive on the issue of whether a party must prevail in order to be eligible for consideration for an award of fees is our holding in ***Todd v. AIG Life Ins. Co.***, 47 F.3d 1448 (5ᵗʰ Cir. 1995). In ***Todd***, Justice White, sitting by designation and writing for the Court, in determining whether the "lodestar" method for calculating attorneys' fees is appropriate in ERISA cases, noted that while the Supreme Court has endorsed the lodestar method in

24

cases involving fee-shifting statutes where Congress has authorized the award of fees to a prevailing party, "ERISA does not use the 'prevailing party' language in its attorneys' fee provision." *Id*. at 1459. Justice White went on to describe the analysis which courts should use in determining attorneys' fees under ERISA. The first step, he noted, is to "determine whether "the party is entitled to attorneys' fees by applying the five factors enumerated in *Bowen*[12]." *Id*. Conspicuously absent from this first step is a requirement that the "party" under consideration for attorneys' fees be the prevailing one. Combined with Justice White's prior notation regarding the failure of Congress to include the prevailing party limitation in ERISA's fee provision, *Todd* can be read as supporting the proposition that there is no absolute requirement that a party prevail in order to recover attorneys' fees.

We decline to join the Fourth Circuit in its reliance on "the weight of authority" from other circuits imposing a prevailing party limitation on the availability of attorneys' fees under ERISA, as that reliance, for the reasons discussed above, is subject to considerable doubt. Indeed, the greater weight of authority, from outside and within our own circuit, supports the notion that a party need not prevail in order to be eligible for an

---

[12] *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255 (5th Cir. 1980).

25

award of attorneys' fees under § 1132(g)(1) of ERISA.

### b.   Fees and Costs for General American

Having determined that there is no requirement that a party prevail in order to be eligible for consideration for attorneys' fees under ERISA, we now turn to consider whether the district court abused its discretion in awarding and denying attorneys' fees and costs below.   In this case, the district court properly identified the appropriate five factors to be used in determining the underlying awards of attorneys' fees under ERISA.   Those factors are as follows:

(1) the degree of the opposing parties' culpability or bad faith;

(2) the ability of the opposing parties to satisfy an award of attorneys' fees;

(3) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances;

(4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' position.

*Todd*, 47 F.3d at 1458 (citing *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255 (5th Cir. 1980)).

Appellant urges that the district court abused its discretion in awarding General American its fees and costs because, as she

26

contends, it was not the prevailing party, and it acted in bad faith. As discussed above, the prevailing status of the parties is not determinative of the fee awards, though generally, a proper analysis of the five factors will in most instances favor an award of fees to the party which has most substantially prevailed.

With respect to the first factor, the district court relied on its conclusion that General American did not withhold payment in bad faith, but rather that it did so in an effort to resolve the potentially conflicting claims of Appellant and her minor children in light of the investigation into her involvement in Mr. Gibbs' death. The district court specifically found that General American "did not act in bad faith . . . [n]or did it fail to conduct an adequate investigation." However, the court did intimate that Appellant proceeded in bad faith as she:

> "brought this suit when it was obvious she was still a suspect in the murder of her husband and when there was absolutely no basis for believing that Defendant had acted in bad faith."

With respect to the second factor, the district court found that the insurance proceeds were adequate enough to satisfy an award of attorneys' fees for General American. With respect to the third factor, upon which it relied most heavily in determining that General American was entitled to have its fees paid out of the interpleaded funds, the district court said "the award of attorneys' fees to [General American] would, hopefully, deter others from filing premature lawsuits to collect insurance proceeds

27

when the beneficiary remains under suspicion of having murdered the insured." And with respect to the fourth factor, the district court found that Appellant had filed suit solely to benefit herself and not any other ERISA plan participant. The district court did not specifically address the fifth factor.

Regarding the first factor, while Appellant may have been a suspect when she brought this action, due to the Hewitt Police Department's allowing her family and friends to completely clean the crime scene, it is likely that Appellant would have remained a suspect indefinitely, and consequently, General American, absent just this type of litigation, could have withheld payment of the benefits to Appellant indefinitely. Notwithstanding her refusal to waive her claim to the proceeds in favor of her minor children while she remained a suspect, it would be difficult to characterize her actions in filing this suit as being taken in bad faith. This factor counsels against awarding General American its attorneys' fees.

Regarding the second factor, Appellant contends that the insurance proceeds are insufficient to sustain an award of fees to General American for $21,100.85 which amounts to nearly one-fourth of the total proceeds of $88,852.00. This argument is strengthened by the fact that, as will be discussed below, Appellant will be required to pay her own attorneys' fees. This factor, therefore, also counsels against awarding General American its attorneys' fees.

28

With respect to the deterrent effect discussed by the district court (the third factor), given the totality of the circumstances, and General American's reluctance, however justified, to release the insurance proceeds, it would not serve the goals of ERISA to deter others from instituting litigation which would force the interpleading of disputed insurance proceeds for resolution of the proper disbursement thereof, especially in situations such as this, where doing otherwise could permit the insurance company to indefinitely postpone resolution of the proper disbursement. The district court used the third deterrent factor as a sword to discourage beneficiaries from pursuing a claim when they are suspected of being involved in the insured's death, rather than as this factor was intended to be used, as a shield, to protect beneficiaries from the fear of having to pay to pursue an important ERISA claim in the event of failing to prevail. Clearly, Congress intended the fee provisions of ERISA to encourage beneficiaries to assert their rights without fear of being responsible for the fees and costs of their opponent's attorneys if they failed to prevail. The district court's use of this factor, though somewhat logically justified based upon Appellant's awareness that she was clearly a suspect, was an abuse of its discretion in light of the other factors and the totality of the circumstances of this case, which included the fact that General American didn't exercise its "good faith" in interpleading until after it had been sued, and the fact

29

that without physical evidence, Appellant might remain a suspect *ad infinitum*.

With respect to the final factor, the relative merits of the parties' positions, the district court itself acknowledged that, even considering the polygraph evidence, this was a "close case." And while the district court obviously believed that Appellant was likely involved somehow in the murder of her husband, her position can hardly be deemed to be so disproportionately meritless as to justify the imposition of an award of attorneys' fees to General American based on this factor.

In sum, the first, second, third, and fifth **Todd** factors all counseled in favor of disallowing General American's request for attorneys' fees and costs from Appellant. We therefore find that the district court improperly relied upon the third deterrence factor and that it abused its discretion in awarding General American its attorneys' fees and costs.

### c. Fees and costs for Appellant Carolyn Gibbs

Appellant also argues that the district court abused its discretion in denying her request for attorneys' fees and costs from General American as she was the prevailing party. She recites, as argument, all of the same reasons advanced for why the award of fees to General American was an abuse of discretion. The district court stated:

> Defendant [General American] in this case did not act in bad faith in failing to approve Plaintiff's claim. Nor did it fail to conduct an adequate investigation. Accordingly, Plaintiff is not entitled to an award of attorney's fees.

The district court's conclusion relies heavily upon the first and fifth *Todd* factors, and upon its conclusion that General American acted completely in good faith. The district court also noted with respect to the fourth factor that Appellant filed suit only to benefit herself and no other ERISA plan participant, and that she was not seeking to resolve any significant legal issue regarding ERISA itself which would justify an award of her attorneys' fees.

An additional argument under the third, deterrence factor exists for denying Appellant an award of attorneys' fees, and this argument is implicit in the district court's conclusions. Permitting the award of such fees would actually serve to encourage beneficiaries suspected of involvement in the death of an insured to file premature lawsuits, before their alleged involvement can either be established or ruled out, and this deterrence argument weighs more heavily against an award to Appellant for her fees than the reverse argument did regarding an award of fees against Appellant and in favor of General American when the insurance company has delayed action on a claim.

For the reasons discussed above, the district court's decision to deny her request for attorneys' fees and costs was not an abuse of discretion.

31

## 2. Guardian ad litem fees

Appellant also argues that the district court abused its discretion in awarding Intervenors their guardian ad litem's fees out of her proceeds, instead of assessing the same against General American, whom she contends was the non-prevailing party.  With respect to the guardian ad litem's fees, the district court undertook no analysis of the *Todd* factors.[13]  In fact, the district court merely stated "[t]he guardian ad litem's fees will also be deducted from the insurance proceeds currently in the registry of the court."

Intervenors argue that in determining attorneys' fees, the court should take into account the fact that a guardian ad litem's role is different than that of the attorney for a party.  They point to authority which stands for the proposition that the guardian ad litem, when appointed by the court, occupies a dual role as an advisor for his assigned client and an officer to the court.  *See duPont v. Southern Nat. Bank*, 771 F.2d 874, 882 (5th Cir. 1985); *Friends for All Children v. Lockheed Aircraft Corp.*,

_____

[13]  We pause here to note that the issue of attorneys' fees under ERISA applied only to the dispute between Appellant and General American.  The standard governing the guardian ad litem's entitlement to fees is governed not by ERISA, but rather by Texas state law as it relates to their action under § 21.23 of the Texas Insurance Code.  And to the extent that any of the ad litem's fees are taxable as costs against Intervenors' opposing party (Appellant), that issue is governed by Rule 54(d) of the Federal Rules of Civil Procedure.

725 F.2d 1392, 1401 (D.C. Cir. 1984) (Mikva J., dissenting). According to Intervenors, the ad litem's unique role justifies payment for his services regardless of the outcome of the case for his clients. *See Stephen Allen Lynn Profit Sharing v. S.A. Lynn P.C.*, 25 F.3d 280, 280-81 nn.1,2 (5th Cir. 1994); *duPont*, 771 F.2d at 882 (citing with approval, Judge Mikva's dissent in *Friends for All Children*, 725 F.2d at 1400-01). We agree, but only insofar as the ad litem acts in the capacity as a guardian ad litem and not as an attorney ad litem.

In *duPont*, we held that where the same person acts in the capacities as both a minor's guardian ad litem and as his attorney ad litem, only the person's expenses in the former role are taxable as costs under Fed. R. Civ. P. 54(d). *See id.* at 882. His fees and expenses in the role of attorney ad litem would be treated as any other attorneys' fees. In the case where the attorney ad litem recovers assets or proceeds for the minor or protects the same, then his fees may be assessed against the assets or the proceeds so recovered or protected. *See, e.g., duPont*, 771 F.2d at 882-83; *Kollsman v. Cohen*, 996 F.2d 702, 706 n.3 (4th Cir. 1993) (citing *Folsom v. McDonald*, 237 F.2d 380, 381-82 (4th Cir. 1956)). However, in the event he tries to recover and fails, the guardian ad litem acting in the capacity as an attorney for the minor is in no better position than an attorney retained by any litigant under normal circumstances. *See Kollsman*, 996 F.2d at 706. The *Kollsman* court

33

adequately explained why an appointed attorney ad litem is in no better posture than retained counsel with respect to entitlement to fees:

> The guardian ad litem's presence is necessitated by the litigation and it is his duty to determine policy regarding litigation. The guardian ad litem is frequently not an attorney and if legal services are required, he must seek and employ counsel. Counsel obtained thereby on behalf of a ward or incompetent is in no different circumstance from counsel for any other litigant. *See* **Hull by Hull**, 971 F.2d at 1511; **duPont**, 771 F.2d at 882; **Schneider**, 658 F.2d at 854-55; **Franz**, 38 F.2d at 606. An attorney who serves as both legal counsel and guardian ad litem does not thereby acquire any greater right to recover his fees than have his brethren who are hired directly by a litigant. **Id.**

**Kollsman**, 996 F.2d at 706.

In its answer and interpleader, General American requested that the court appoint a guardian ad litem to represent the interests of the minor children and require that they be joined as parties so that Carolyn and the minor children could "settle amongst themselves their rights to the money due under the policy." At the point of interpleader, the district court appointed Mr. Kuchera "as guardian ad litem for [the children]" and directed that Kuchera "file all appropriate pleadings on behalf of the minor children and represent their interests for all purposes" (emphasis added). In no manner, did the district court **require** that Kuchera file an intervenor complaint under § 21.23 for the purpose of litigating the children's entitlement to the proceeds. Rather, as

34

in the general case where a guardian ad litem is appointed to represent the interests of minor children with respect to disputed proceeds, the guardian ad litem's initial task was to assess his wards' potential claim of entitlement and decide what course of action should be taken on behalf of his wards, i.e., litigate, settle or waive their claim.

Here, Kuchera examined the circumstances of this case and decided to file a motion to intervene and to file a complaint on behalf of the children asserting their entitlement to the proceeds. He was unsuccessful, and by failing to preserve or recover assets or proceeds for his clients in his capacity as their attorney, and not as their guardian, he is in no better position than a separate counsel he might have retained. At the time Kuchera decided to try to establish Appellant's involvement, there was no lie detector evidence, and only limited circumstantial evidence of her involvement in Mr. Gibbs' death. Additionally, Appellant had not been charged or indicted, and based on the botched investigation, it was likely that she never would be. Kuchera's decision to pursue the § 21.23 claim of entitlement to the proceeds was a gamble; he rolled the dice hoping he could get the necessary evidence to recover proceeds for the children, and he was unsuccessful. Whether or not Texas state law would permit recovery of attorney's fees by the attorney ad litem for an unsuccessful claimant under § 21.23 out of the insurance proceeds in question is an issue which the district court did not address, either factually

35

or legally.

Furthermore, the only part of Kuchera's expenses which are taxable as costs against any party under Rule 54(d) of the Federal Rules of Civil Procedure are those expenses related to his role as the guardian ad litem. And those costs are taxable only against the prevailing party, Appellant in this case, upon a showing of good cause. Under *Rogers v. Wal-Mart Stores, Inc.*, 686 S.W.2d 599, 600 (Tex. 1985), we think the trial court correctly found good cause within the record of this case to support awarding those limited costs against Appellant since the district court did say that she was "likely" involved, that General American acted in "good faith," and that Kuchera made a good faith effort on behalf of the children. Consequently, we have determined that remand is necessary in order to give the district court the opportunity to determine which of Kuchera's claimed expenses fall under each category, that is -- which are recoverable guardian ad litem expenses taxable as costs, and which are non-taxable attorney ad litem expenses. The district court should also determine whether, under Texas state law, the latter category of expenses may be recovered by the guardian ad litem from Appellant and/or General American.

## CONCLUSION

For all of the foregoing reasons, we **AFFIRM** the judgment of

the district court in so far as it denies attorneys' fees and costs to Appellant Carolyn Gibbs; **REVERSE** the judgment of the district court in so far as it awards attorneys' fees and costs to Appellee General American Life Insurance; **VACATE** the judgment of the district court insofar as it awards attorneys' fees and costs to Intervenor-Appellees' guardian ad litem, John Kuchera; and **REMAND** with instructions that the district court determine, pursuant to *duPont v. Southern Nat. Bank*, 771 F.2d 874 (5th Cir. 1985), which of Mr. Kuchera's fees and expenses were generated in his role as guardian ad litem, and tax such fees and expenses as costs against Appellant Carolyn Gibbs and/or General American. The district court should also determine whether the portion of Mr. Kuchera's fees and expenses generated in his role as attorney ad litem are recoverable from Appellant and/or General American under Texas state law in the circumstances of this case.

**AFFIRMED in part; REVERSED in part; VACATED in part; and REMANDED.**

BENAVIDES, J., specially concurring:

I join the judgment of the majority and its holding that under our decision in duPont v. Southern Nat'l Bank of Houston, Texas, 771 F.2d 874 (5th Cir. 1985), Mr. Kuchera cannot recover his attorney ad litem fees as costs under Federal Rule of Civil Procedure 54(d). duPont binds this panel to its holding. I nevertheless write separately to emphasize my conviction that we painted with too broad a brush in deciding duPont.

While duPont forecloses payment of Mr. Kuchera's fees in his capacity as attorney, as opposed to guardian, ad litem pursuant to Rule 54(d), the court simultaneously revealed another possible avenue for compensating attorneys ad litem: "when an attorney ad litem acts to preserve a trust for the benefit of a minor, then his expenses, although not taxable as costs, can be recovered from the trust." 771 F.2d at 883 (citing United States v. Equitable Trust Co., 283 U.S. 738 (1931)). This rule is a well-established exception to "American Rule" that "absent statute or enforceable contract, litigants pay their own attorneys' fees." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257 (1975). See id. ("[T]he 1853 [fee statute] was read as not interfering with the historic power of equity to permit the trustee of a fund . . . , or a party preserving or recovering a fund for the benefit of others . . . , to recover his costs, including his attorneys' fees, from the fund . . . itself[.]"). I believe that American General's deposit of the funds into the district court's registry, under the

38

circumstances (where American General made no claims to the funds as such and whereby it relieved itself of potential liability for payment of the funds to the improper party) is sufficiently analogous to a settler's contribution of funds to a trust to warrant application of this rule. Mr. Kuchera acted to preserve the interpleader funds for the benefit of the Gibbs children, and he may therefore be able to recover his fees from the insurance proceeds.

Unfortunately, here, the district court did not award fees against the fund on the basis of this theory, but instead pursuant to Rule 54(d). I would remand for consideration of attorneys fees also under this alternative theory described in duPont.

Texas law, which provides for payment of ad litem fees by the prevailing party, see Tex. R. Civ. Proc. 141 (permitting an assessment of costs against a prevailing party for good cause shown on the record), articulates the compelling rationale for duPont's alternative theory: "those who accept ad litem appointments should be reasonably sure of receiving a fee for their services." Dover Elevator Co. v. Servellon, 876 S.W.2d 166, 171 (Tex. Civ. App. 1993, no writ); see also Cahill v. Lyda, 826 S.W.2d 932, 933 (Tex. 1992). Quite logically, without such assurances, courts might find themselves unable to obtain necessary representation for minors in

court.[14]   Indeed, securing needed representation of minors is so important in Texas that the designation of the representative as "guardian ad litem" or "attorney ad litem" has little bearing on the recovery of attorneys' fees: "the paramount concern is not the technical designation of the representative but the protection of the minor's interest."  Phillips Petroleum Co. v. Welch, 702 S.W.2d 672, 674 (Tex. Civ. App. 1995, no writ).[15]   In my view, to the extent that duPont precludes payment of Mr. Kuchera's fees pursuant to Rule 54(d), the reasoning of the Texas courts persuasively explains why such an outcome is undesirable.

I take some heart from our decision today to sanction the district court's consideration of the availability of attorneys' fees under Texas law, to be paid either out of the insurance proceeds or by Carolyn Gibbs or American General.  I remain convinced that an attorney, who in good faith and with good cause, undertakes an obligation imposed upon him by the district court both to protect the interests of minors and to file pleadings on their behalf, and who undisputably discharges this obligation in a

---

[14] In fact, the Supreme Court cites a similar explanation for the historic rule of equity permitting a trustee litigating on behalf of a fund to recover his attorneys' fees from the trust: "'Such a rule of practice,' it has been said, 'is absolutely essential to the safety and security of a large number or persons who are entitled to the protection of the law–indeed, stand most in need of it–but who are incompetent. . . to ask for protection or redress.'"  Equitable Trust, 283 U.S. at 744 (quoting Voorhees v. Polhemus, 36 N.J.Eq. 456, 458 (1883)).

[15] Significantly, Texas state courts routinely use "guardian ad litem" and "attorney ad litem" interchangeably.  See Estate of Catlin, 936 S.W.2d 447, 452 (Tex. App.–Houston (14th Dist.) 1996, no writ) ("The attorney ad litem in this case was appointed pursuant to rule 173 which provides [for the appointment of a guardian ad litem.]"); Strawder v. Thomas, 846 S.W.2d 51, 64 (Tex. App.–Corpus Christi 1992, no writ) ("[C]ompensation to be paid to the guardian ad litem (attorney ad litem) shall be fixed by the court[.]").

faithful and responsible manner should not be abandoned by the system that has required and made use of his services. This is not to say that all attorneys' fees incurred in connection with ad litem representation would be compensated merely because the attorney initiated some legal action. Certainly, unreasonable or bad faith efforts on behalf of the client should not result in compensation.

Here, however, the facts of the case indicated the complicity of a party, Carolyn Gibbs, in a criminal offense, and the district court found that Carolyn Gibbs more likely than not participated, in some manner, in Joel Gibbs' death. In these circumstances, a reasonable attorney, consistent with his duties imposed on him by virtue of his appointment by the court, should have sought to recover the insurance funds for the Gibbs children, as Mr. Kuchera did. Far from "rolling the dice" and "gambling" on recovery, Mr. Kuchera's decision to intervene was virtually dictated by the facts themselves; he acted in a measured and reasonable manner, which was calculated to protect the best interests of the Gibbs children.[16] His reasonable and good faith efforts in this regard should not go uncompensated.

With these comments, I join the judgment of this court

---

[16] In fact, had he not intervened on behalf of the Gibbs children, he would have exposed himself to a potential malpractice suit that either of the Gibbs children could have brought upon attaining the age of majority. See, e.g., Byrd v. Woodruff, 891 S.W.2d 689, 708 (Tex. App.–Dallas 1994, no writ) ("We hold that the guardian ad litem . . . can be liable in a civil action for damages resulting from a breach of his duties as a personal representative for the minor.").

remanding Mr. Kuchera's claim for attorneys' fees for further consideration by the district court and join the court's opinion with respect to its resolution of American General's claim for attorneys' fees.