**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 3, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

CHRISTY O. ANDREWS,

Plaintiff-Appellant,

v.

BLUE CROSS BLUE SHIELD OF
NEBRASKA EMPLOYEE GROUP
LONG TERM DISABILITY
INSURANCE PLAN; JEFFERSON
PILOT FINANCIAL LIFE
INSURANCE COMPANY, a Nebraska
Corporation formerly known as
Guarantee Mutual Life Co.,

Defendants-Appellees.

No. 05-1278
(D.C. No. 01-CV-1020 MSK/MJW)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **PORFILIO**, and **BRORBY**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

---

[*]     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (ERISA).  Plaintiff Christy O. Andrews appeals from the district court's entry of judgment on stipulated facts in favor of defendants Blue Cross Blue Shield of Nebraska Employee Group Long Term Disability Insurance Plan (Blue Cross) and Jefferson Pilot Financial Life Insurance Company (Jefferson Pilot), formerly known as Guarantee Mutual Life Company (GMLC).  We have jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I.  Background

From May 1995 to the end of 1996, Andrews worked for a subsidiary of Blue Cross, Corporate Diversified Services, Inc. ("Diversified").  She participated in an employee welfare benefit plan insured by a policy administered by GMLC, now Jefferson Pilot.  She was paid a monthly salary and a commission on sales. In November and December 1996, Diversified paid her $2,120.84 in commissions. On January 1, 1997, she became a direct employee of Blue Cross.  She participated in the same employee welfare benefit plan insured by the same policy (Plan).  She received a monthly salary of $595 and was placed on a different commission structure than she had with Diversified.  On October 21, 1997,

Andrews stopped performing work for Blue Cross because of her health, and she officially resigned her position on December 31, 1997. During the ten-month period beginning on January 1, 1997, and ending on October 31, 1997, Blue Cross paid her $5,950 in base salary and $36,931.36 in commissions. In November and December of 1997 as well as in 1998, Blue Cross paid her additional commissions totaling $15,603.76 for work she performed prior to October 21, 1997.

In September 1999, Andrews filed a claim under the Plan for long-term disability (LTD) benefits. Jefferson Pilot denied the claim and three appeals. On May 7, 2001, Andrews filed this lawsuit. In a letter dated September 10, 2001, one of her doctors, Dr. Murray, concluded that Andrews did not have multiple sclerosis or neuropathy (earlier tentative diagnoses), but that her central nervous system "problem is most likely secondary to small vessel cerebral ischemic vascular disease, i.e., she has a cerebral vasculopathy[1] . . . . She clearly could be disabled secondary to this affecting her overall cognitive functioning." Aplt. App. Vol. IV at 1354. Based at least in part on Dr. Murray's report, Jefferson Pilot concluded in a letter dated September 24, 2001, that Andrews was entitled to LTD benefits from January 18, 1998, to March 19, 2001, and reserved judgment

---

1  According to Dr. Murray, a cerebral vasculopathy is a "hardening of the arteries present in the cerebral vasculature." Aplt. App. Vol. IV at 1358.

as to whether she was entitled to benefits for an additional period until obtaining further medical documentation.

With the question of liability in large part resolved, the focus of this case turned to how to calculate the benefit to be paid. Under the Plan, the amount of the monthly benefit requires a determination of Andrews' "basic monthly earnings," defined as:

> BASIC MONTHLY EARNINGS or PREDISABILITY INCOME means the Insured Employee's monthly rate of earnings from the Employer in effect:
> 1.  just prior to the date the Elimination Period begins; or
> 2.  just prior to the date an approved leave of absence begins, if the Elimination Period begins while the Insured Employee is continuing coverage during a leave of absence.
>
> It does not include bonuses, overtime pay and other extra compensation other than commissions. Commissions will be averaged over the 12 month period prior to the date the Elimination Period begins. It will not exceed the amount which is shown in the Employer's payroll records; or for which premium has been paid (whichever is less).

Aplt. App. Vol. III at 896.[2]

The term "earnings" is not defined separately in the Plan. The parties advanced different interpretations of "earnings," particularly as it encompasses

---

[2]   The "Elimination Period" referred to is a ninety-day period calculated from the first day of disability during which no benefits are payable. *See* Aplt. App. Vol. III at 895, 897. There appears to be no dispute that the Elimination Period in this case began on October 21, 1997.

commissions. Defendants argued that the commissions portion of Andrews' "basic monthly earnings" should be calculated by adding up the amount of commissions she was actually paid during the twelve-month period commencing November 1, 1996, and ending on October 31, 1997. Andrews argued that "earnings" should be interpreted to include any commissions she "earned" prior to her last day of work for Blue Cross even though she was not paid those amounts until after the Elimination Period began.

Finding "earnings" to be ambiguous, the district court agreed with defendants that it included only those commissions actually paid to Andrews during the twelve-month period that ended on October 31, 1997. The court therefore entered judgment in favor of defendants. The court also concluded that, under the circumstances of the case, Andrews was not entitled to an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g). This appeal followed.

## II. Interpretation of the Plan

When, as here, an ERISA plan does not give the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a district court reviews the denial of benefits de novo. *DeBoard v. Sunshine Min. & Ref. Co.*, 208 F.3d 1228, 1241 (10th Cir. 2000). Likewise, "we apply a de novo standard of review to [q]uestions of law, such as a court's interpretation of an ERISA plan." *Id.* at 1242 (alteration in original) (quotation omitted).

"Questions involving the scope of benefits provided by a plan to its participants must be answered initially by the plan documents, applying the principles of contract interpretation." *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1515 (10th Cir. 1996). We give the language of an ERISA plan "its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Id.* at 1511 (alteration in original) (quotation omitted). "If we determine the plan language is ambiguous, we may look at extrinsic evidence." *DeBoard*, 208 F.3d at 1240 (quotation omitted).

We begin our inquiry by examining the definitions of "earnings" and related terms from two dictionaries, one lay and one legal. *Webster's* defines "earnings" as "something (as wages or dividends) earned as compensation for labor or the use of capital." *Webster's Third New Int'l Dictionary of the English Language (unabridged)* 714 (1993). In turn, to "earn" is "to *receive* as equitable return for work done or services rendered: have accredited to one as remuneration." *Id.* (emphasis added). *Black's* defines "earnings" as "[r]evenue gained from labor or services, from the investment of capital, or from assets. See INCOME." *Black's Law Dictionary* 548 (8th ed. 2004). *Black's* defines "income" as "[t]he money or other form of payment that one *receives*, usu[ally] periodically, from employment, business, investments, royalties, gifts, and the

like.  See EARNINGS." *Id.* at 778 (emphasis added).  *Webster's* defines "income" as "a gain or recurrent benefit that is usu[ally] measured in money and for a given period of time . . . but *excludes unrealized advances in value*." *Webster's* at 1143 (emphasis added).

The recurring theme in these definitions is *receipt*.  Although *Webster's* also defines "earn" as "to come to be duly worthy of or entitled to as remuneration for work or services," *id.* at 714, and *Black's* also defines "earn" as "[t]o do something that entitles one to a reward or result, whether it is received or not," *Black's* at 547, we think that the common and ordinary meaning of "earnings" in the employment context requires *receipt*.  Consequently, the commissions that are averaged over the twelve-month period prior to the beginning of the Elimination Period are those commissions that Andrews actually received during that period.  This monthly average of commissions actually received, when combined with Andrews' monthly salary rate just prior to the beginning of the Elimination Period, produces the "monthly rate of earnings" referred to in the definition of "basic monthly earnings."

This interpretation is supported by and consistent with other language in the Plan.  In particular, the term "predisability income" (which figures into other types of benefits payments, *see, e.g.*, Aplt. App. Vol. III at 909-10, 912) shares the same definition in the Plan as "basic monthly earnings," *see id.* at 896.  Based

on the definitions of "income" noted above, we interpret "predisability income" to include the average of commissions actually received during the twelve-month period prior to the beginning of the Elimination Period. Interpreting "basic monthly earnings" to include unpaid but "earned" commissions, as Andrews suggests, would lead to inconsistent applications of the same definition.

Furthermore, the Plan places two limitations on "basic monthly earnings," that "[i]t will not exceed the amount which is shown in the Employer's payroll records; or for which premium has been paid (whichever is less)." *Id.* at 896. The amount of the premium is calculated as a percentage of the "Total Covered Payroll per Month." *Id.* at 893. "Total Covered Payroll is the total amount of Basic Monthly Earnings for all Employees insured under [the Plan]." *Id.* at 899 (capitalization omitted). Thus, to calculate "Total Covered Payroll per Month" and the corresponding premium payment, one must look to the amount of "basic monthly earnings" for all covered employees as reflected in the payroll records.

The term "payroll records" is not defined in the Plan. However, the record contains a series of documents entitled "Payroll Register with DIV/DPT Totals," Aplt. App. Vol. II at 554-602. These documents show that Blue Cross made semi-monthly payments of salary and commissions to Andrews from January through October 1997. The record contains no other evidence that shows

commissions were paid or considered "earned" (i.e., that the employee was entitled to be paid for the underlying work) on any other basis. Nor is there anything in the record that suggests premium payments were based on anything other than amounts, including commissions, actually paid to covered employees in any particular month. Based on the record evidence, the amount of the premium and both limitations on "basic monthly earnings" depend upon the amount actually paid to employees during any one month, including commissions, as reflected in Blue Cross's payroll register. This does not include commissions to be paid in the future that derive from work performed during an earlier pay period. Accordingly, whether, as Andrews suggests, her W-2 forms for 1997 and 1998 are "payroll records" is irrelevant to the extent they include commissions paid after October 31, 1997.

Our interpretation of the term "earnings" is not undermined by Jefferson Pilot's inclusion in its calculation of Andrews' "basic monthly earnings" the commission payment documented in the payroll register dated October 31, 1997, which was ten days after the beginning of the Elimination Period. Contrary to Andrews' argument, Jefferson Pilot's inclusion of this commission payment as the final one for deriving the twelve-month average does not establish a "practice" of including commissions paid after the onset of disability. Rather, the October 31 payroll register covers a period of time prior to the beginning of the Elimination

Period, October 16-20, during which Andrews continued to work. Commissions paid for this period, therefore, are distinguishable from those commissions Andrews later received during periods wholly after the beginning of the Elimination Period, which Jefferson Pilot excluded from the calculation.[3]

### III. Attorney's Fees and Costs

In any action brought by an ERISA plan participant, the court has discretion to award "a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Andrews contends the district court improperly denied her request for attorney's fees and costs. We review this denial for abuse of discretion. *Gordon v. U.S. Steel Corp.*, 724 F.2d 106, 108 (10th Cir. 1983). "To hold that the district court abused its discretion, we must have a definite conviction that the court, upon weighing relevant factors, clearly erred in its judgment." *Id.*

ERISA is silent as to whether a party must be a "prevailing party" in order to obtain an award of attorney's fees and costs. This circuit's precedent suggests that a party must prevail in order to be considered for an award of attorney's fees and costs under ERISA. *See, e.g., Chambers v. Family Health Plan Corp.*,

---

[3]      Based on our disposition, we need not reach the question of whether the doctrine of *contra proferentem*, a doctrine of last resort under which ambiguities in a document are construed unfavorably to the drafter, is applicable in ERISA cases subject to a de novo standard of review.

100 F.3d 818, 828 (10th Cir. 1996) (recognizing the statute permits an award to either party but declining to award fees or remand for the district court to determine the issue because the plaintiff did not prevail on any of his claims); *Arfsten v. Frontier Airlines, Inc. Ret. Plan for Pilots*, 967 F.2d 438, 442 n.3 (10th Cir. 1992) (stating that arguments on attorney's fees were moot where party did not prevail); *Morgan v. Indep. Drivers Ass'n Pension Plan*, 975 F.2d 1467, 1471-72 (10th Cir. 1992) (declining to remand on attorney's fees issue for district court merely to state that the requesting party had not prevailed); *Anderson v. Emergency Med. Assocs.*, 860 F.2d 987, 992 (10th Cir. 1988) (characterizing a request for attorney's fees and costs by a party that did not prevail as "unsupportable"). *But see Gibbs v. Gibbs*, 210 F.3d 491, 503 (5th Cir. 2000) (holding that "there is no absolute requirement that a party prevail in order to recover attorneys' fees" under ERISA).

It appears that the district court considered each party to have prevailed in part, Andrews as to liability and defendants as to the benefit calculation. This equipoise, combined with the fact that the bulk of the litigation was devoted to an issue on which Andrews did not prevail, namely, the benefit calculation, were the governing considerations in the district court's decision not to award attorney's fees and costs to Andrews. Under such circumstances, we cannot say that the district court clearly erred in denying attorney's fees and costs to Andrews.

-11-

The judgment of the district court is **AFFIRMED**.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge