Revised February 1, 2002

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 00-50505**

_____


**RYAN DICKERSON, A Minor, by and through his Parents,**
**Daniel Dickerson and Suzanne Dickerson, and as Next**
**Friends; DANIEL DICKERSON, as Next Friend of their**
**Minor Son, Ryan Dickerson; SUZANNE DICKERSON, as Next**
**Friend of their Minor Son, Ryan Dickerson; DANIEL**
**DICKERSON, Individually; SUZANNE DICKERSON, Individually,**

**Plaintiffs-Appellees,**


**VERSUS**


**UNITED STATES OF AMERICA,**

**Defendant-Appellant.**


_____

Appeal from the United States District Court
for the Western District of Texas
_____


January 16, 2002

Before JONES, SMITH, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Plaintiffs sued the United States under the Federal Tort Claims Act ("FTCA") for damages to Ryan Dickerson incurred during his childbirth. The government acknowledged liability and the sole issue at trial was damages. The United States Government now

appeals a judgment against it for damages of $44,717,681 on the grounds that the damages are limited by the plaintiffs' prior administrative claims of $20 million. In the alternative, the government argues that the award should be reduced, in accordance with the "maximum recovery" rule, to $28.45 million. The government additionally asserts that the guardian ad litem fees should be taxed, in part, as attorney's fees rather than the whole amount being taxed to the government.

**BACKGROUND**

On March 19, 1998, a pregnant Suzanne Dickerson was diagnosed with a condition called pregnancy-induced hypertension ("PIH"). This condition can impair the placenta's ability to extract and exchange oxygen which in turn impairs the oxygen supply of the unborn child.[1] This causes the unborn child not only to receive insufficient oxygen, but also results in a build-up of carbon dioxide, which causes the blood's pH to decrease and results in a condition known as acidosis which can result in severe organ damage. Damage to the unborn child can be avoided by a timely caesarean section; however, no such operation was performed on Suzanne Dickerson. On March 20, 1998, Suzanne Dickerson was admitted to Sheppard Air Force Base Hospital for the delivery of

---

[1] The placenta is the organ of respiration for the unborn child.

2

her child.  After approximately 15 hours of labor, the obstetrician attempted to perform an operative vaginal delivery of her baby, Ryan.  After unsuccessfully trying to deliver Ryan with forceps and a vacuum extractor, the obstetrician resorted once again to using forceps and Ryan was delivered at about 11:00 p.m. on March 20, 1998.  Unfortunately, the conditions surrounding Ryan's birth, including the failure to perform a caesarean section, caused Ryan to suffer catastrophic brain damage, destroying 65%-70% of his brain tissue.

Ryan demonstrated profound injuries at birth and had an extremely low pH level of 6.75 for his blood.[2]  For the first ten days of his life, Ryan was in a coma.  Ryan continued to demonstrate signs of severe damage throughout his time at the hospital until his release to his parents on April 10, 1998.

In May of 1998, Ryan's father filed a "Request For CHAMPUS Benefits" and, in that form, Dr. Charles Morton, Chief of Developmental Pediatrics at Wilford Hall Medical Center in San Antonio, indicated that Ryan was at a high risk for spastic quadriplegia cerebral palsy and severe developmental disorders.  On June 1, 1998, Dr. Eltman, a neurologist who had been treating Ryan, wrote a letter in support of the Dickersons' request to the Air Force that Ryan's father be assigned to an installation that could

---

[2]     A normal human's blood has a pH of 7.35-7.45 though it is not uncommon for a newborn baby to have a pH of 7.2.  Lower numbers indicate that the blood is more acidic than normal.

support Ryan's needs.  In that letter, Dr. Eltman gave a prognosis that Ryan would suffer from mental retardation, cerebral palsy and visual impairment as well as a high likelihood of seizures as a result of his neurological injury.

On June 24, 1998, the Dickersons prepared administrative claims with the Department of the Air Force pursuant to 28 U.S.C. § 2675 seeking $20 million in damages.  Specifically, they sought $15 million on behalf of Ryan and $5 million total on behalf of Ryan's parents in their individual capacities.  In January of 1999, after they deemed their administrative claims denied, the Dickersons filed a FTCA action.  The government did not contest liability, and the only issue at trial was damages.

In their original complaint, the Dickersons sought damages of $20 million, consistent with their administrative claims.  In December of 1999, the Dickersons filed their first amended complaint asking for $55 million ($25 million for Ryan and $30 million for themselves).  The Dickersons accompanied their motion for leave to amend with a declaration stating that, when they filed their administrative claims, they did not have a complete set of medical records or know the severity of Ryan's injuries.  The district court granted their motion to file an amended complaint on December 9, 1999.  The government filed a timely amended answer to the amended complaint preserving the defense that the Dickersons

4

were not entitled to damages in excess of the $20 million requested in their administrative complaint.

The district court found damages for the plaintiffs in the total amount of $44,717,681. The government now appeals, claiming it was error to allow the damages in excess of the administrative claims.

**DISCUSSION**

The Administrative Damages Cap in FTCA Cases

The standard of review for factual determinations in a FTCA case is whether the district court's findings are clearly erroneous. Fed.R.Civ.P. 52(a); *Low v. United States*, 795 F.2d 466, 470 (5th Cir. 1986); *Ferrero v. United States*, 603 F.2d 510, 512 (5th Cir. 1979) ("In FTCA cases the clearly erroneous standard governs our review of factual determinations, including damages."). A trial court's findings are clearly erroneous when, after reviewing the entire evidence, the Court is left with the definite and firm conviction that a mistake has been committed. *Ferrero*, 603 F.2d at 512.

The government asserts that the Dickersons' claims should have been limited by 28 U.S.C. § 2675(b), which states:

> Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon

5

> allegation and proof of intervening facts, relating to the amount of the claim.

Under the above section, claimants under the FTCA cannot claim more than asked for in their administrative claims unless it is justified by newly discovered evidence. The government contends that the Dickersons failed to meet the standard for newly discovered evidence set out in *Low v. United States*, 795 F.2d 466 (5th Cir. 1986).

At the outset, the Dickersons claim that the government's case should be dismissed because it failed to raise the administrative cap as an affirmative defense and also because it did not specify the amount of the administrative cap. Both of these contentions are without merit. It is clear from the record and the district court's findings of fact that the government at least included the affirmative defense of limiting the damages in its answer to the complaint. The cases cited by the Dickersons involved situations where the government did not include the affirmative defense in their pleadings. Pleading the administrative cap defense, however, is enough to preserve the defense for appeal. *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987) (stating, in a FTCA case, that the affirmative defense of damage limitation by statute must be pleaded timely).

Further, the Dickersons' contention that the government should lose because it failed to include the amount of the administrative claims is not supported. The district court's findings of fact

6

included a statement that "[t]he Defendant timely answered, raising the defense that the Plaintiffs are limited to the damages alleged in their administrative claims (Standard Form 95s) and original complaint. . . ." Also, the reference to the original complaint's damage request could act as giving the trial court notice of the amount.[3] Furthermore, in order for jurisdiction to exist in this case, an administrative claim had to be filed pursuant to 28 U.S.C. § 2675. The district court recognized this filing as an undisputed fact and therefore could examine the claim to determine the reach of its jurisdiction. *Cf.* ***Frantz v. United States***, 29 F.3d 222, 224-25 (5th Cir. 1994) (holding that, because an administrative claim was a jurisdictional prerequisite to suit under the FTCA, the claims made in the administrative claim put the government on notice of the possibility of such claims being made in the actual suit); ***Bush v. United States***, 703 F.2d 491, 494 n.1 (11th Cir. 1983) (finding that, because an administrative claim was a prerequisite to jurisdiction, the district court was obliged to examine the claim). If nothing else, the amount, and the other information provided in the claim, was recognized by virtue of the fact that the administrative claims were taken on judicial notice.

Now turning to the question of whether the amount in the claim limits the Dickersons' recovery, in ***Low***, this Court held that the

---

[3] The administrative claims amount is also stated in the government's proposed findings of fact.

question of whether damages could be increased under § 2675(b) presented a twofold issue. *Low*, 795 F.2d at 470. First, did the district court err in finding that the post-claim evidence as to the extent of the injuries, the prospects of recovery, the extent of recovery, and of the life expectancy could not have been discovered at the time the plaintiff filed its administrative claim? *Id.* Second, do these facts represent newly discovered evidence or intervening facts for the purposes of § 2675(b)? *Id.* The second prong of the analysis has several requirements. "First, the evidence must support the increase in the prayer over the administrative claim." *Id.* "Next, the allegedly newly discovered evidence or intervening facts must not have been reasonably capable of detection at the time the administrative claim was filed."[4] *Id.* Therefore, it seems there is first a subjective test as to whether the specific injuries were known at the time the administrative complaint was made. Then there is an objective test as to whether the plaintiff could have made out its worst-case scenario based on the basic severity of the injuries that were known. *Reilly v. United States*, 863 F.2d 149, 172-73 (1st Cir. 1988).

In its findings of fact and conclusions of law, the district court articulates that it permitted the plaintiffs to exceed their

_____

[4]    Though this language seems confusingly similar to the first prong, the court in *Reilly v. United States*, 863 F.2d 149, 172-73 (1st Cir. 1988), has interpreted this to mean that the two prongs establish a subjective and an objective test.

8

administrative claims because at the time that claim was filed, "the full extent and ramifications of the minor's brain damage were not known. . . . Plaintiffs had not been able to obtain a complete set of the medical records describing the minor's birth at the time the administrative claim was filed." This finding really only speaks to the first prong, however, and does not shed any light on the question of whether the plaintiffs knew the basic severity of their son's injuries and if they could have made out a worst-case scenario from this knowledge.

Though it seems that the district court was not clearly erroneous in its finding that the Dickersons did not have knowledge as to the specific injuries, it is clear that they could have reasonably obtained this information based on the basic severity of Ryan's injuries, and so the second prong is not met. Many factors work against the Dickersons and in favor of the government on this point. One of the elements of the second prong is that "the evidence must support the increase in the prayer over the administrative claim." *Low*, 795 F.2d at 470. A comparison of the complaints compared to the administrative claims does not support the increase in the present case.

The Dickersons' administrative claims were for $20 million. In their first complaint, the Dickersons requested damages in this same amount to compensate for Ryan's irreversible brain damage and the neurologic sequlae of such brain damage. This was consistent

9

with their administrative claims which stated Ryan's injuries as being severe, permanent and irreversible neurologic sequelae and permanent irreversible brain damage. The Dickersons then filed a motion for leave to file an amended complaint stating that they were entitled to ask for an amount over the administrative claims because they now knew that Ryan's injuries would make him severely mentally retarded and cause him to suffer severe cerebral palsy and cortical blindness. The Dickersons were granted leave, but, in their amended complaint, the injuries and elements of damages sections were virtually the same as in the first complaint that was consistent with the administrative claims. The only difference was that the Dickersons were now asking for a total of $55 million. Yet nothing cited in their leave to amend or in their amended complaint justifies a $35 million increase over the amount asked for in the administrative claims that is for the same injuries.

The second prong also contains an element that the "allegedly newly discovered evidence or intervening facts must not have been reasonably capable of detection at the time the administrative claim was filed." *Id.* This element proves fatal to the Dickersons' attempt to increase their claims over their administrative claims based on a combination of facts in the record. First, based on the amount asked for in the administrative claims ($20 million), it would appear that the Dickersons must have

10

had some inkling of the severity of Ryan's injury.[5]  Second, on the administrative claims made by the Dickersons, they indicated that they were seeking relief due to Ryan's severe, permanent and irreversible neurologic sequelae and permanent irreversible brain damage.  *See, e.g.* **Lebron v. United States**, ___ F.3d ___ (5th Cir. 2002) (stating, in a factually similar case, that the worst-case scenario could have been made based on the severity known and described in the administrative claims).  Also, on June 1, 1998, Dr. Eltman wrote a letter in support of the Dickersons' request to the Air Force that Ryan's father be assigned to an installation that could support Ryan's needs stating that Ryan would suffer from mental retardation, cerebral palsy and visual impairment as well as a high likelihood of seizures as a result of his neurological injury.

The Dickersons indicate that they never saw this letter, but it is clear from the record that they maintained continuous contact with Dr. Eltman from the time of Ryan's birth and throughout the trial.  It certainly was possible for them to ask Dr. Eltman to give them his prognosis of Ryan so that they could make out the "worst-case scenario" for their administrative claims.  The Dickersons defend that when dealing with these type of injuries to

---

[5]     Though this fact by itself is not and should not be determinative, combined with the other facts in the record it displays that the Dickersons knew the basic severity of Ryan's injury and should have thus made out their worst-case scenario when filing the administrative claims.

an infant, it is impossible to give a reasonable prediction of the severity of the injuries sustained.[6] This argument fails, however, because it relies on the very reasoning that § 2675(b) is intended to avoid. In *Low*, this Court enunciated the policy behind the administrative cap, stating:

> [I]f the exact nature, extent and duration of each recognized disability must be known before § 2675(b) will be given effect, that section will be rendered useless; and the government will be unable to evaluate any claim made against it without the threat that, if it does not settle, its liability may increase substantially.

*Low*, 795 F.2d at 471; *see also* **Lebron**, ___ F.3d ___ (noting that the provision encourages settlements). It is apparent from the record that the Dickersons were at all times since his birth aware of the basic severity of their son's injuries. There is no reason why they could not have taken this into account when making their administrative claim so as to envision their "worst-case scenario." As the Dickersons have failed to meet the second, objective prong

---

[6] The Dickersons also contend that there were delays in getting the medical record that prevented them from knowing the extent of Ryan's injuries. The timing of when Ryan's medical records were requested or received is unclear. It appears that a formal written request for medical records concerning Ryan was not made by the Dickersons' attorney until June 24, 1998 (the same day the administrative claims were filed). The receipt of such records is irrelevant, however, in light of the above facts supporting a finding that the Dickersons could have objectively made out their "worst-case scenario" in their initial administrative claims. Even if the Dickersons did not request the medical records until filing the claims, they still could have amended their administrative claims after filing at any time before bringing suit pursuant to 28 C.F.R. § 14.2(c) (1998).

12

of *Low*, they are precluded from enhancing their claims for damages beyond the amount asked for in their administrative claims.

The Guardian Ad Litem Fees as Costs

The government contends that it was error for the district court to assess all of the guardian ad litem's fees as costs to the government because the guardian ad litem was acting as an attorney when he rendered some services. The district court has broad discretion in determining the appropriateness of an award of attorneys' fees and costs. *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). Therefore, the court should review a district court's award or denial thereof for an abuse of discretion. *Id.; duPont v. Southern Nat'l Bank of Houston, Tex.*, 771 F.2d 874, 882 (5th Cir. 1985). Under *Gibbs*, the only part of a guardian ad litem's expenses that are taxable as costs are those expenses related to his role as the guardian ad litem. *Gibbs*, 210 F.3d at 507. "[W]here the same person acts in the capacities as both a minor's guardian ad litem and as his attorney ad litem, only the person's expenses in the former role are taxable as costs under Fed.R.Civ.P. 54(d)." *Id.* at 506.

The major issue, therefore, is whether the guardian ad litem went beyond his court appointed role and acted as an attorney. The government cites to the record on appeal numerous times in support of this contention. However, even if the guardian did participate

13

in the case, this could be to adequately protect the minor's interests as is consistent with his role as guardian ad litem. Under *Gibbs*, the activities that can be attributed to being the attorney ad litem should not be taxed as costs so it becomes necessary to determine what activities should be attributed to what role. It does not appear that this point was adequately developed at the trial court and therefore, on remand an evidentiary hearing should be held to determine what, if any, activities were attributable to the guardian ad litem acting as an attorney ad litem. *Lebron*, ___ F.3d at ___.


The Awarding of Post-Judgment Interest

The government never addressed this issue in its original appellate brief and only raises the issue in its response brief. The government claims this is permissible because the issue is jurisdictional in nature and, as such, can be raised at any time. The government contends that interest should only accrue from the date of filing of the transcript of the judgment with the Secretary of the Treasury in accordance with 31 U.S.C. § 1304(b)(1)(A).

Though the government is raising this for the first time in its response brief, they are correct in asserting that this is permissible. "Interest is recoverable against the United States only when specifically provided for by statute because only by statute can the United States waive its sovereign immunity."

14

*Transco Leasing Corp. v. United States*, 992 F.2d 552, 554 (5th Cir. 1993) (quoting *Reminga v. United States*, 695 F.2d 1000, 1001-02 (6th Cir. 1982)). In a suit under the FTCA, recovery can only be had to the extent that Congress has waived its sovereign immunity. *Lucas v. United States*, 807 F.2d 414, 417 (5th Cir. 1986). Waiver of sovereign immunity, therefore, is a jurisdictional prerequisite to being sued. This court has stated that the government's sovereign immunity, being a jurisdictional prerequisite, may be asserted at any stage of the proceedings. *Bank One, Tex., N.A. v. Taylor*, 970 F.2d 16, 34 (5th Cir. 1992).

Under 28 U.S.C. § 1961(b), interest shall be compounded daily to the date of payment except as provided in § 1304(b) of Title 31. Section 1304(b) authorizes interest to accrue when the judgment of the district court is filed with the Secretary of the Treasury, and it ceases to accrue on the day before the day the mandate of affirmance is issued by a court of appeal. Section 1304 applies to post-judgment interest in FTCA cases because § 1304 lists 28 U.S.C. § 2414 as one of the statutes covered thereby and § 2414 is the statutory authority for payment of judgments against the United States. *Lucas*, 807 F.2d at 423. Therefore, the government is correct in its assertion that the interest should not accrue until such time as the judgment was filed.

**CONCLUSION**

15

Having carefully reviewed the record of this case and the parties' respective briefing and for the reasons set forth above, we conclude that the district court clearly erred in allowing the Dickersons to recover more than the amount asked for in their administrative claims. The district court's judgment must therefore be vacated and the case remanded to the district court for entry of a new judgment which does not exceed the $20 million asked for by the Dickersons in their administrative claims under the Federal Tort Claims Act. Upon remand, the district court shall reapportion this sum in a manner so as to indicate the separate amounts to be recovered by the mother and father individually, the separate amounts to be awarded to the mother and father in trust for future medical care for Ryan, and the separate amounts to be awarded in trust for the benefit of Ryan. This judgment should likewise be revised to provide for the accrual of interest from the date the final judgment is filed with the Secretary of the Treasury. Finally, in regard to the issue of whether the fees and expenses of the guardian ad litem are taxable as costs, we hold that, under *Gibbs*, only those activities that were performed in the attorney's role as guardian ad litem can be taxed as costs. As this issue was not developed in the district court, we remand it so that the district court may hold an evidentiary hearing to determine what portion, if any, may be recovered as costs of court. We therefore VACATE the district court's judgment and REMAND the

16

case so that the district court may enter a judgment consistent with this Court's decision.

**VACATED** and **REMANDED.**