WILSON, Circuit Judge,
concurring in part, dissenting in part:
I concur with the majority on the liability issue and on apportionment of damages. However, I would not interfere with the district court’s award of non-economic damages.
The standard of review governing a claim of excessive damages is well-established. Damage calculations are factual determinations committed to the sound discretion of the factfinder. Hence, we review the factfinder’s award for clear er *1171 ror. Ferrero v. United States, 603 F.2d 510, 512 (5th Cir.1979). Our role on appellate review is not to reassess the credibility of the witnesses or re-weigh the evidence. See Williams v. United States, 405 F.2d 234, 239 (5th Cir.1968) (“We are not fact finders.”). Furthermore, we are not authorized to substitute our judgment for that of the district court under the clear error standard of review. Id. (“Thus, while we might differ with the District Court regarding the amount of the award in this case, we cannot say that under the evidence it was ‘clearly erroneous.’ ”). If there are two possible views of the evidence, the district court’s preference for one of them cannot be clearly erroneous. “We [will] judge a trial court’s finding to be clearly erroneous [only] when, after reviewing the entire evidence, we are ‘left with the definite and firm conviction that a mistake has been committed.’ ” Ferrero, 603 F.2d at 512 (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
Seldom are injuries identical, and there is no formula prescribed by law to calculate non-economic damages. Consequently, the amount awarded for pain and suffering will vary widely from case to case. Such damages “are largely speculative and difficult of determination, but no one’s estimate is better than [the factfinder]’s.” Winner v. Sharp, 43 So.2d 634, 636 (Fla.1950). The factfinder is simply required to award an amount it finds reasonable in light of the evidence.
Although the award of non-economic damages in this case is large, “a large damage award by itself is not indicative of an excessive or improper verdict.” Citrus County v. McQuillin, 840 So.2d 343, 347 (Fla. 5th DCA 2003). “If the jury’s award is so extravagant that it shocks the judicial conscience, or is manifestly unsupported by the evidence or indicates the jury was influenced by passion, prejudice or other matters outside the record, the court in its discretion may set aside the verdict.” Id. This FTCA case was not considered by a jury. Instead, this case was presented to the court during an eleven-day bench trial. Regardless, we apply the same standard to review the damage award. The majority is unable to point to any indication in the record that the United States District Judge who awarded the plaintiffs damages in this case was influenced by prejudice or passion. Nor is there any discussion in the majority opinion of any mistake of fact, or evidence outside the record that influenced the judge as factfinder. Rather, by plowing a new and rather circuitous route, the majority concludes that the size of the verdict shocks the judicial conscience. To get there, the majority creates a new rule for Florida: Florida and federal courts are limited to considering only published appellate decisions when reviewing damage verdicts for excessiveness. More about that later.
The evidence in this case showed that Kevin Bravo was profoundly brain damaged as a result of his birth-related injuries. The delivering physician testified that the standard of care, given the clinical evidence of distress and danger, required Kevin to be delivered by 5:00 a.m. Even if the physician had called a cesarean section by 7:30 a.m., with delivery at 8:00 a.m., Kevin would have been normal. Yet, due to the negligence of multiple government actors, Kevin was not delivered until 1:20 p.m. This resulted in Kevin being born cyanotic, with no heart rate, respirations, muscle tone, or muscle reflex. It was only after 13 minutes of resuscitation that Kevin’s heart finally began to beat, although he remained unable to breathe and without muscle tone or reflex.
At 29 months (his age at the time of trial), Kevin had the developmental stage of a 0-1 month old. He did not suck, *1172 swallow, eat, speak, see, hear, roll, sit, or respond to any stimuli except pain. When anyone moved Kevin’s body, he screamed in pain because his muscles were permanently contracted. Kevin’s muscles were so rigid that his hip bones were pulled out of their sockets and his leg was broken during a therapy session. Kevin had to be tube fed every few hours and suctioned with a machine up to 20 times an hour to prevent him from choking on his own secretions. He had been hospitalized 20 times in two years. Experts testified that Kevin had a life expectancy of approximately 20 years and would require around-the-clock care for life, in addition to several surgeries and extensive therapy.
The record also contains evidence that Raiza Bravo suffered from major depression and anxiety as a consequence of the traumatic experience of Kevin’s birth and resulting injuries. At trial, she described the extreme emotional pain she endured daily in tending to her son’s needs while knowing he would never have a normal life. Her psychiatrist prescribed numerous medications to treat her depression, anxiety, and insomnia. Raiza testified that she and her husband could not go out together alone because they could not leave Kevin, and they felt restricted from taking him to social places because of all the machines he required. Because of Kevin’s needs, his parents no longer socialized with friends, which made them feel isolated. At trial, Kevin’s father explained how, like his wife, his life completely revolved around Kevin. He testified that, while they had planned to have at three or four children, Kevin’s condition influenced their decision not to have other children until Kevin’s health improved. They both testified that, because of the attention Kevin needed, they were no longer the young, romantic, and active couple they once were.
According to the district court:
Kevin has been robbed of the life to which he was entitled, while his parents have been robbed of the son, and the relationship with their son, to which they were entitled. No one in the case disputed the magnitude of Kevin’s injury, or the magnitude of the impact it has had on all of their lives. Everyone agreed Kevin’s parents remain devoted to providing Kevin with the most loving and supportive environment possible, at great sacrifice to themselves. Florida law provides compensation for these losses.
The district court awarded $10 million to Kevin for “any bodily injury” and “any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future.” The court also found that Kevin’s parents should be compensated “[f]or any loss ... by reason of the injury to [their] son, Kevin, of his companionship, society, love, affection, and solace.” Originally, the court awarded non-economic damages of $25 million to Kevin’s mother and $15 million to Kevin’s father. The court reduced these awards by $10 million each after the government filed its post-trial motion. This resulted in a final non-economic damage award of $15 million to Kevin’s mother and $5 million to Kevin’s father, for a total of $30 million (including the $10 million awarded to Kevin).
Although each case must be decided on its own facts and circumstances, we generally consider the amounts awarded in prior cases for similar injuries to help determine whether a damage award for pain and suffering is excessive. The Florida Supreme Court has held:
In cases where damages for mental pain and suffering are allowed, it must bear some reasonable relation to ... the philosophy and general trend of deci *1173 sions effecting such cases. When we say that the amount allowed must bear some reasonable relation to such factors, we do not mean that it must be equal to, be twice these, or bear any other arbitrary relation to them....
Fla. Dairies Co. v. Rogers, 119 Fla. 451, 161 So. 85, 88 (1935).
The majority opinion states that in determining the philosophy and general trend of decisions effecting these cases in the State of Florida, we look only to reported Florida appellate decisions. This misstatement of Florida law allows the majority to ignore recent jury verdicts in factually similar cases awarding comparable or higher damages for pain and suffering.
The majority opinion also disregards McGee[1] as an “outlier,” which is a 2002 Florida District Court of Appeal case where a much larger non-economic award was upheld. The facts of that case closely mirror our own, and it ensures that the award in this case is not excessive.
I will compare the damage awards in McGee and the other factually similar cases to the award in this case, but first I will address the majority’s new and unprecedented holding that we are limited to published appellate decisions by the Florida District Courts of Appeal when reviewing for excessiveness.

Johnson v. United States

The majority relies heavily on our prior opinion in Johnson v. United States, 780 F.2d 902 (11th Cir.1986), to support its holding that only prior published appellate opinions are relevant to determine whether a personal injury damage award in Florida is excessive. Johnson does not stand for this proposition. The case involved a $2 million dollar non-economic award to parents of a 21-month-old boy who died after consuming a large quantity of iron. There are no details about the child’s injury. The Johnson court engaged in a discussion of damages to provide some helpful guidance to the district court on remand. Id. at 906 (“Although the case is remanded for further evidentiary proceedings and reconsideration of liability, it is appropriate for this Court to rule upon other issues raised for appeal for guidance to the district court on remand.”). All the panel then said about damages was that it was unable to locate a reported case approving a comparable award. Id. at 908. The court suggested that the plaintiffs compile “some research” on “similar cases tried in Florida” and submit them to the district court so that it could “be made part of the record to furnish a basis for the amount that should ultimately be awarded.” Id. I find no language in the Johnson opinion limiting excessiveness review to published appellate decisions and excluding consideration of similar damage awards in comparable cases. In fact, the Johnson court actually said: “[Fjlorida appellate courts rely heavily on the damages awarded by juries in similar cases.” Id. (emphasis added.) It did not limit consideration to published Florida appellate decisions. The Johnson court had nothing to compare the award to, as we do in this case, thus, the court was without a way to assess and measure the award. Johnson also left open the possibility that the award in that case was reasonable.[2] The *1174 majority misconstrues Johnson to defend its flawed methodology, ignoring recent, factually similar cases with comparable non-economic damage awards. To accept the majority’s logic is to conclude that if there was a factually identical case resulting in an unpublished opinion affirming the same damage award as in this one, we could not consider it.

Florida Courts Look Beyond Published Florida Appellate Decisions

To my knowledge, no Florida state or federal court, before today, has held that only published Florida appellate cases are relevant to the philosophy and general trend analysis. The majority opinion creates this rule for the first time. Before today, reviewing courts have always been able to consider comparable verdict awards in similar cases without limitation to reported published decisions.
In Loftin v. Wilson, 67 So.2d 185 (Fla. 1953), cited in Johnson, the Florida Supreme Court relied on two Florida cases and five non-Florida cases, (i.e., two unap-pealed New York trial court decisions, two Missouri Supreme Court decisions, and an Ohio Supreme Court decision) as comparators in making an excessiveness determination. Id. at 189-90. Additionally, the Florida Supreme Court stated that it considered “many other” cases reviewed in a treatise, 16 A.L.R.2d 3. Id. at 190.[3]
Our own federal district courts in Florida are the same. In Williams v. United States, 681 F.Supp. 763 (N.D.Fla.1988), decided after we issued our opinion in Johnson, the district court expressly considered “jury verdicts involving the wrongful death of a minor child rendered in Escambia County, Florida,” id. at 764, as well as *1175 cases from the Florida district courts of appeal, id. at 764-65.
In Grayson v. United States, 748 F.Supp. 854 (S.D.Fla.1990), aff'd in part, vacated in part, 953 F.2d 650 (11th Cir.1992), the reviewing court considered “nineteen wrongful death verdicts and settlements from courts in south Florida that were submitted by plaintiff.” Id. at 863 (emphasis added). We affirmed the district court’s judgment in Grayson, vacating only the award of interest from the date of initial judgment as opposed to the date of affirmance. Grayson v. United States, 953 F.2d 650 (11th Cir. Jan. 14, 1992) (unpublished).
In Turner v. United States, No. 3:03-CV-709-J-25TEM, 2005 WL 2077297 (M.D.Fla. Aug. 26, 2005), rev’d in part on other grounds, 514 F.3d 1194, the district court looked solely to two jury verdict reports in similar medical malpractice cases in finding that the damages were reasonable. Id. at *8.
In Fairhurst v. United States, No. 3:03CV601/RS, 2006 WL 2190553 (N.D.Fla. Aug. 1, 2006), the court considered three settlement awards as well as two trial verdicts in determining that the award was reasonable. Id. at *4.
Moreover, Florida’s District Courts of Appeal (“DCAs”) have historically looked outside the realm of its own appellate court system to measure excessiveness. In Washington County Kennel Club, Inc. v. Edge, 216 So.2d 512 (Fla. 1st DCA 1968), cert. dismissed, 225 So.2d 522 (Fla.1969), Florida’s First DCA considered appellate court decisions in Missouri and Georgia. In City of Tamarac v. Garchar, 398 So.2d 889 (Fla. 4th DCA 1981), overruled in part on other grounds by Seaboard Coastline R.R. v. Addison, 502 So.2d 1241, 1242-43 (Fla.1987), Florida’s Fourth DCA looked beyond Florida decisions to the District of Columbia U.S. Court of Appeals, as well as two California appellate state cases and one Nevada appellate state case when conducting an excessiveness determination. Id. at 896 n. 7.
More recently, Florida’s Fourth DCA discussed the trial court’s use of the Williams analysis in Hyundai Motor Co. v. Ferayorni, 842 So.2d 905, 908 (Fla. 4th DCA 2003). While the court distinguished Williams because it “was decided in 1988 and relied on verdicts returned between 1974 and 1987,” id. at 909, it did not in any way suggest that the Williams approach was improper or that a trial court could not consider unappealed jury verdicts when testing a damage award for exces-siveness. The court simply concluded that the original jury verdict should stand because the trial court’s remittitur was based on stale information. Id. (“The Williams opinion recognized that cases decided more than five years earlier were of limited value.”).
That same year, Florida’s Fifth DCA looked to an unpublished and unappealed Delaware trial court, an unpublished Texas appellate court, a Texas appellate court, a Missouri appellate court, and a Florida federal district court in identifying a trend in damage awards for loss of a child, parent, or spouse. McQuillin, 840 So.2d at 347-48. Likewise, in 2004, the Third DCA considered a federal New York district court case in determining that the award was excessive. Star-Rite Indus., Inc. v. Levey, 909 So.2d 901 (Fla. 3d DCA 2004), cert. denied, 919 So.2d 435 (Fla.2005).[4]
*1176 Therefore, it is clear that even the Florida DCAs do not restrict their review of damage awards to comparisons of published decisions from the state’s appellate courts. No court in Florida has heretofore limited the comparative analysis to published Florida appellate decisions.

Glabman, McQuillin and McGee

Our role is to review the size of the non-economic damage award to ensure that it does not exceed the maximum limit of the reasonable range set by awards in similar Florida cases. The question of excessiveness is not the kind of question that should subject itself to irreconcilable splits between courts, thus requiring us to choose one over the other, which is what the majority opinion does with Glabman, McQuillin and McGee. Instead, we review the award to determine whether it is “so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.” Bould v. Touchette, 349 So.2d 1181, 1184-85 (Fla.1977).
Glabman was about a teenage girl who died from Lupus complications. Glabman v. De La Cruz, 954 So.2d 60, 62 (Fla. 3d DCA 2007). The jury found the girl’s physician to be 80 percent negligent and awarded the parents $8 million dollars. Id. at 61-62. On review, the Third DCA recognized that the father’s trial testimony was “highly emotional” and caused the father, the court personnel, and the trial judge to cry. Id. at 62. In fact, the jury returned a verdict for $2 million dollars more than what the parent’s counsel had requested. Id. at 62. Consequently, the Third DCA found that the award was “so excessive” that it “could only have been a product of passionate emotion based on [the father’s] emotional testimony.” Id. at 63. These facts are dramatically different than our own. The government points to no highly emotional evidence — let alone any evidence that caused court personnel or the United States District Judge who heard this case to cry. The judge here did not award an amount in excess of what was requested by the plaintiffs. And liability was not a close question — the gov- *1177 eminent concedes that plaintiffs injuries were due to medical negligence.
McQuillin involved a woman who died in a car accident — an accident for which she was found to be 80 percent negligent, while the defendant was found only 20 percent negligent. Citrus County v. McQuillin, 840 So.2d 343 344-45 (Fla. 5th DCA 2003). The jury awarded the woman’s son $4.4 million for pain and suffering. Id. at 347. After commenting that the award was “on the outer limit in size,” the Fifth DCA held that the amount determination was not for it to decide, but for the jury:
Who can place a dollar value on a human life, measured by the loss and grief of a loved one? That difficult question is generally one for the jury or factfinder, not the appellate court.
Id. at 348.
The Fifth DCA in McQuillin approved the jury verdict.
McGee involved a family of four, all of whom were burned because of a design defect in their car’s gas tank. Gen. Motors Carp. v. McGee, 837 So.2d 1010, 1015-16 (Fla. 4th DCA 2002). While the parents and daughter survived, the son died shortly after the accident from severe burns covering 98 percent of his body. Id. at 1016. Like this case, the McGee parents endured extraordinary pain and suffering in watching their son suffer without being able to assist him. Id. at 1015-16, 1039. The parents were awarded $30 million dollars for their pain and suffering. Id. at 1030. On review, the Fourth DCA found that the verdict “was not ‘so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.’ ” Id. at 1039 (quoting Bould, 349 So.2d at 1184). The $30 million dollar non-economic award in McGee was for the parents alone. Id. at 1030. In this case, Kevin Bravo’s parents received somewhat less ($20 million). When you combine Kevin’s non-economic award with his parents, the total award still does not exceed the non-economic damages approved by the Fourth DCA in McGee.
To dismiss McGee as an outlier or an annoyance, is, in my view to usurp the applicable Florida law. I can find no precedent in Florida to support an excessive determination made by lining up awards in similar cases, cutting off the top award, and treating the lower awards as a ceiling to the amount that can be awarded.
I am also unaware of any Florida DCA case suggesting that the DCAs are split on the question of excessiveness. Yet, because the majority perceives a DCA-split on this question, the majority says it has a duty to follow the Third DCA decision in Glabman — rather than the Fourth DCA decision in McGee. According to the majority, the Third DCA trumps because it would have had jurisdiction over this case had it been filed in the state system. This sets an interesting precedent. Since the majority holds that the DCAs are split on what constitutes an excessive verdict, Eleventh Circuit courts applying Florida law to excessiveness determinations will systematically consider case law from the jurisdictionally-relevant DCA as controlling. Rather than applying Florida law, our courts will routinely apply a jurisdictional subset of Florida law. I do not know of any Florida DCA that, as a rule, makes excessiveness determinations by confining itself solely to its own DCA precedent.[5] But, ironically, we will be doing *1178 just that, and we will say we are following Florida law in doing so. If there was ever an incentive for forum shopping, this is it — and the shopping only works in federal courts of the Eleventh Circuit.

Similar Awards in Recent Cases

In addition to McGee, there are other similar cases that show Bravo’s award to be non-excessive. Bravo has called our attention to three judgments entered after jury verdicts in comparable cases within the last three years that included non-economic damages exceeding the damages finally awarded by the district court in this case. Korzeniowski v. Eagleman, No. CL 00-4828 AO, 2004 WL 3206914 (Fla.Cir.Ct.2004), a medical negligence case arising in Palm Beach County involving a child who was born with a comparably devastating brain injury, resulted in a $31 million non-economic damage award — $17 million for the child’s past and future pain and suffering, $7 million for the mother’s loss of filial consortium, and $7 million for the father’s loss of filial consortium. Hinton v. 2331 Adams Street Corp., No. 01-012933(12) (Fla.Cir.Ct.2003), a similar case from Bro-ward County, involved a two-year-old child who suffered severe brain damage and resulted in a $45 million combined non-economic damage award — $35 million for the child’s past and future pain and suffering, $5 million for the mother’s loss of filial consortium, and $5 million for the father’s loss of filial consortium. Again, in Navarro v. Austin, No. 02-6154 (Fla.Cir.Ct. 2006), a trial court in Hillsborough County entered judgment on a jury verdict awarding over $100 million in damages, $46.5 million of which was for the injured plaintiffs past and future pain and suffering and $52.5 million of which was for the wife’s past and future loss of her husband’s services, comfort, society, and affection. These trial court judgments in comparable cases demonstrate that the damage award in this case was not “so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the [trier of fact] may properly operate,” the only instance in which an appellate court should disturb a verdict for damages. Bould, 349 So.2d at 1184-85 (“In tort cases[,] damages are to be measured by the [factfinder’s] discretion. The court should never declare a verdict excessive merely because it is above the amount which the court itself considers the [trier of fact] should have allowed.”).
Florida puts the burden on the appellant to demonstrate clear error by coming forward with factually similar cases demonstrating that a damage award exceeds the maximum limit of a reasonable range. It has long been the rule in Florida that “[t]he burden is on an appellant to demonstrate that the jury rendered an excessive [verdict].” Seaboard Coastline R.R. Co. v. McKelvey, 259 So.2d 777, 781 (Fla.App. 3d DCA 1972). The government failed to make its case, and we should not make it for them, creating Florida law in the process.

Other FTCA Awards

There have been other FTCA awards with higher non-economic damages. See Gutierrez v. United States, 2007 WL 2827720 (C.D.Cal.2007) (total award of $55,184,288, of which $31,750,000.00 was non-economic damages to child and mother in a car accident case brought under the FTCA). There have also been FTCA awards with higher total amounts. See Dickerson v. United States, 280 F.3d 470 (5th Cir.2002) (total award of $44,717,681.00 to parents and child where medical negligence during birth delivery resulted in profound brain and neurological injuries to the child). The verdict in Dickerson was ultimately reduced on appeal, not because it was excessive, but because the plaintiffs were precluded from *1179 recovering more than the $20 million dollars they requested in their administrative claim. Id. at 479.

Conclusion

By holding that we may only look to published appellate decisions when testing a damage award for excessiveness, the majority re-writes Florida law. We do not have the authority to make Florida law. That is the task of the Florida courts and the Florida legislature, and we should leave that task to them.[6]
I find no clear error on the part of the United States District Judge, who heard and considered the evidence and awarded the plaintiffs their damages after an eleven-day bench trial. The majority opinion fails to make the case that the verdict is unsupported by the evidence, that it is based on anything outside of the record, or that it reflects passion or prejudice by the judge. Nor does the verdict “shock the judicial conscience” when compared with other verdicts in similar cases, some of which are higher and some of which are lower. Remanding this case back to the district court for a lower damages award constitutes an improper invasion into the realm of factfinding. Therefore, I would affirm.

. Gen. Motors v. McGee, 837 So.2d 1010 (Fla. App. 4th DCA 2003).

. Unlike this case, medical malpractice liability in Johnson "was a close call, at best.” Johnson, 780 F.2d at 908. In this case, medical negligence is clear. As the majority puts it in its opening paragraph, all that is at issue in this case is how much the government "must pay”. As to the damage award in Johnson (a 22 year-old case), we do not know how much plaintiffs were awarded on remand. It could conceivably have been more.

. The majority opinion disregards Loftin, contending that: (1) a later Third DCA case, Seaboard Coast Line R.R. Co. v. McKelvey, 259 So.2d 777 (Fla. 3d DCA 1972), adopted the rule that the comparative analysis is solely confined to published Florida appellate cases; and (2) the Florida Supreme Court affirmed McKelvey in Seaboard Coast Line R.R. Co. v. McKelvey, 270 So.2d 705, 706 (Fla.1972) (“McKelvey II”). This is incorrect for two reasons. First, while the court in McKelvey cited to published Florida appellate decisions as comparators, the court never held that the comparative analysis was confined to such cases. Indeed, the court actually made clear that it considered "a number of authorities throughout this country” when gauging the reasonableness of the award before it. McKelvey, 259 So.2d at 780. If any inference is to be drawn from McKelvey, it is that the comparative analysis is not confined solely to published Florida decisions. Second, in McKelvey II, the Florida Supreme Court did not address the scope of the comparative analysis; it simply affirmed the Third DCA's holding that the award was reasonable. McKelvey II, 270 So.2d at 706. McKelvey II certainly cannot be understood to overrule Loftin. Florida state courts cannot "decline to follow a supreme court opinion in the absence of a specific indication by the court itself that the case is no longer viable.” McGee v. State, 570 So.2d 1079, 1081 (Fla. 3d DCA 1990) (citing cases); see also Puryear v. State, 810 So.2d 901, 905 (Fla.2002) ("Where a court encounters an express holding from this Court on a specific issue and a subsequent contrary dicta statement on the same specific issue, the court is to apply our express holding in the former decision until such time as this Court recedes from the express holding.”). Likewise, we may not turn to Florida’s intermediate courts when the Florida Supreme Court has spoken on the issue — as it has in Loftin. Freeman v. First Union Nat'l, 329 F.3d 1231, 1232 (11th Cir.2003). The majority opinion departs from our precedent in Freeman by failing to regard Loftin as binding and controlling Florida authority on this question.
The majority also cites to two other Third DCA cases. See Metro. Dade County v. Dillon, 305 So.2d 36 (Fla. 3d DCA 1974); Compania Dominicana de Aviacion v. Knapp, 251 So.2d 18 (Fla. 3d DCA 1971). Nowhere in either of these cases does the Third DCA hold that, as a rule, the comparative analysis is confined to published Florida appellate cases. Again, even assuming arguendo that they did, Loftin would still bind us.

. The majority states that Levey cited Slade v. Whitco Corp., 811 F.Supp. 71 (N.D.N.Y.1993) and other cases not to compare awards in those cases, but for the proposition that a damages award “not based upon sufficient credible evidence" cannot be sustained.
The relevant passage from Levey is as follows:
In the light of the equivocal and uncertain testimony that Lorenzo would enjoy a normal life expectancy of more than forty years, and the almost entirely speculative testimony that, despite his vegetative state, *1176 he actually suffered excruciating "conscious" pain and suffering for all that period, the amount of the verdict is shockingly excessive, see Brown v. Stuckey, 749 So.2d 490 (Fla.1999); MBL Life Assurance Corp. v. Suarez, 768 So.2d 1129 (Fla. 3d DCA 2000); Jeep Corp. v. Walker, 528 So.2d 1203 (Fla. 4th DCA 1988); Slade v. Whitco Corp., 811 F.Supp. 71 (N.D.N.Y.1993), aff'd, 999 F.2d 537 (2d Cir.1993), and as such, and as we find, contrary to the manifest weight of the evidence. Miller v. First American Bank and Trust, 607 So.2d 483 (Fla. 4th DCA 1992); Florida Nat’l Bank v. Sherouse, 80 Fla. 405, 86 So. 279 (Fla.1920); Ziontz v. Ocean Trail Unit Owners Ass’n, Inc., 663 So.2d 1334 (Fla. 4th DCA 1993); In re: Estate of Simon, 402 So.2d 26 (Fla. 3d DCA 1981).
Levey, 909 So.2d at 909.
Left unaddressed by the majority opinion is that the first string cite in Sta-Rite includes Walker, which contains no discussion of a damages award "not based upon sufficient credible evidence;” indeed, the court approved the jury’s pain and suffering verdict. Walker, 528 So.2d at 1205. Moreover, it is doubtful that the first siring cite aims at awards being stricken for insufficient credible evidence when that proposition is so closely related to the second string cite aimed at awards that are "contrary to the manifest weight of the evidence.” The better reading is that Suarez (striking $4 million award for pain and suffering to four adult children as a result of father’s death in boat accident), Brown (striking $50,000 award for pain and suffering in defamation case), Walker (upholding $4.9 million award for pain and suffering to quadriplegic victim in vehicle accident case), and Slade (upholding $6 million pain and suffering award to brain-damaged and quadriplegic victim of vehicle accident) are all cited to show that the $104,409,053.20 award to the severely brain-damaged victim of a swimming pool accident was "shockingly excessive.” Levey, 909 So.2d at 909.

. Indeed, one of the very Third DCA cases relied upon by the majority looks to the exces-siveness determinations made in other non-Third DCA decisions. See Compania Dominicana de Aviacion v. Knapp, 251 So.2d 18, 23 (Fla. 3d DCA 1971) (evaluating the excessiveness determinations made in two First DCA cases).

. The Florida legislature, in 2003, capped non-economic damages at $1 million in cases of catastrophic injury. See Fla. Stat. § 766.118(2)(b). The fact that the Florida legislature capped non-economic damages does not establish a downward trend for awards in cases like this one; it suggests the contrary. The passage of the non-economic damages cap is an indication that, in the view of the Florida legislature, jury awards in Florida were becoming too high. The legislature explicitly decided that the act does not apply to cases such as this one, which was commenced before September 15, 2003, the effective date of the act.